Richard E. JACOBS, David H. Jacobs, R.F. Coffin, The Northwestern Mutual Life Insurance Company, J & C Associates, Co-Partners, using the name of Madison Joint Venture, Plaintiffs-Appellants and Cross-Respondents,

v.

Robert W. MAJOR and Nu Parable, an unincorporated association, Defendants-Respondents and Cross-Appellants.†

Court of Appeals

*No. 85–0341. Argued December 17, 1985.—Decided May 15, 1986.*

(Also reported in 390 N.W.2d 86.)

† Petition to review granted.

83

87

88

For the plaintiffs-appellants and cross-respondents there were briefs by *Trayton L. Lathrop, Michael J. Lawton, Jill W. Dean,* and *David E. Rohrer* and *Isaksen, Lathrop, Esch, Hart & Clark* of Madison, and oral argument by *Trayton L. Lathrop.*

For the defendants-respondents and cross-appellants there were briefs by *Jeff Scott Olson* and *Julian & Olson, S.C.* of Madison, and oral argument by *Jeff Scott Olson.*

Before Gartzke, P.J., Dykman, J. and Bruce F. Beilfuss, Reserve Judge.

BEILFUSS, J. Richard E. Jacobs, David H. Jacobs, R. F. Coffin, the Northwestern Mutual Life Insurance Company, J & C Associates, doing business as Madison Joint Venture, a partnership owning and operating two regional shopping malls, appeal from a judgment permanently enjoining Robert Major and Nu Parable, an unincorporated, anti-nuclear dance troupe, from performing on partnership properties. Major and Nu Parable cross-appeal. The issues on appeal are: whether the case implicates a constitutional question; whether the recognition of a right of free speech on private property under Wisconsin's constitution would deny appellants their rights under the first, fifth and fourteenth amendments to the United States Constitution; whether the trial court erred by limiting injunctive relief to the prohibition of only certain expressive activities; and whether the trial court abused its discretion in declining to hold Samuel Day, Jr. in contempt for violating a pretrial temporary injunction. The issue on cross-appeal is whether the Wisconsin Constitution secures the right to free speech against private infringements.

We conclude that this case presents unavoidable constitutional issues. All members of this court agree that free expression is one of society's most crucial civil liberties. We differ primarily on the issue of whether Wisconsin's constitution secures the right to free expression against both private infringements and state action. The majority concludes that it does. However, because free speech rights are not absolute, appellants' property and free speech interests under the federal constitution are adequately protected by balancing them against respondents' competing expressional interest. Therefore, our recognition of an expansive guarantee of free expression under the Wisconsin Constitution does not result in a violation of appellants' first, fifth and fourteenth amendment rights. Nonetheless, the record demonstrates that respondents' dance activities have, on balance, interfered with the use of and diminished the value of appellants' property. Therefore, those activities were properly enjoined. Finally, we conclude that the court did not abuse its discretion by limiting the injunctive relief to a prohibition of those dance activities or by refusing to hold Samuel Day in contempt. Therefore, we affirm.

## FACTS

Appellants are the owners of two large shopping malls in Madison, known as the East Towne Shopping Center and the West Towne Shopping Center. Respondent Robert Major was a graduate student at the University of Wisconsin at the time of trial. Respondent Nu Parable is an unincorporated dance troupe organized by Major and others to publicly perform, as a polit-

ical statement, a choreographed depiction of the results of nuclear warfare.

East Towne and West Towne malls are large, enclosed shopping centers containing 95 and 66 tenant stores respectively. Each of the malls also adjoins and is attached to a number of independent, "anchor" department stores. Appellants' rental income from the mall is generated largely through the combination of a base rent and a percentage of each tenant's sales.

Interior corridors, owned by appellants, connect the leased stores and the independent department stores. These corridors are climate controlled and contain numerous fountains, plantings of tropical foliage and carpeted seating areas. The costs of mall maintenance and private security service are borne by the tenants.

The tenants of each mall have formed merchants' associations which, among other things, schedule activities for the interior corridors designed to attract shoppers. These activities are subject to the approval of appellants' mall managers. Since the opening of the malls in the early 1970's, appellants have maintained a strict policy prohibiting political or religious activities, leafletting, handbilling or soliciting of shoppers on the premises.

Major formed Nu Parable in early 1984 as a low budget performance group using only dance and costume to symbolically convey its message about nuclear war. The costume was a red shirt bearing a black and yellow fallout shelter symbol. The dance involved 10 to 12 dancers, lasted about five minutes and concluded with a "die-in" in which bystanders were invited to join the dancers in lying motionless on the floor for several

minutes. The troupe followed its performances with leafletting.

From the beginning, Major envisioned performances at shopping malls. However, Nu Parable's first public dances took place at a U.S. post office, at a public park in Madison, and in the State Capitol rotunda.

In late March, 1984, Major approached East Towne assistant manager Earl Vander Wielen regarding a performance in the mall. Vander Wielen told Major the performance involved potentially controversial issues and refused to approve it.

On April 12, 1984, Major hand delivered a form letter to as many store managers within the mall as he could find. The letter explained the Nu Parable dance, expressed the intent to perform it within the mall on Saturday, April 21, 1984, and solicited the support and cooperation of the merchants. Mall management asked Major to stop distributing the letters, but he refused to do so.

On April 18, 1984, appellants brought this action and obtained a temporary restraining order barring respondents from entering East Towne Mall except as shoppers. About one week later, Major and another Nu Parable member distributed a similar letter to West Towne merchants, expressing the intent to dance there on Saturday, May 5. On May 1, 1984, appellants' complaint was amended to include West Towne and another restraining order was issued covering that premises.

Respondents answered and counterclaimed on May 10, 1984. The counterclaim alleged that appellants' ban on "political, religious and artistic expression" in their malls violated respondents' rights under art. I, sec. 3 of the Wisconsin Constitution. That section

provides in pertinent part: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press." In contrast, the first amendment provides in part that "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." U.S. Const. amend. I.

Major, Samuel Day, Jr. and others entered East Towne Mall on May 19, 1984, and distributed leaflets providing in part:

> Nu Parable wants to dance for you at East Towne Mall but has been legally restrained from doing so by the Ohio corporation which owns the shopping center . . .
>
> [M]ake your views known to the shopkeepers here. Ask them to tell mall manager David Van Dusen that they support free speech at East Towne Mall.

A similar leaflet was distributed on May 26 at West Towne. In each instance, participants leafletted without appellants' consent and refused to leave when requested to do so.

Appellants received a temporary injunction on June 1, 1984, enjoining respondents and all others "acting . . . in concert with them" from entering either East Towne or West Towne except as *bona fide* shoppers. On June 6 and 20, Day and others distributed "Friends of Nu Parable" leaflets at West Towne and East Towne, respectively. Contempt proceedings were instituted against Day on June 21.

A contempt hearing was held on June 29, 1984. The trial court declined to entertain the merits of the motion and instructed appellants to institute a sepa-

94

rate action against Day. We denied appellants' petition for supervisory relief, and a separate injunction action was subsequently commenced against Day and others. Day continued leafletting at both West Towne and East Towne Malls.

On August 9, 1984, Major, William Mutranowski and three others entered East Towne Mall in costume. Mall security personnel asked them not to perform, but the troupe danced and leafletted mall patrons. The press, radio and television covered the event. Several stores within the mall suffered identifiable reductions in sales that day.

On August 21, 1984, the trial court held Major, Mutranowski and the other dancers in contempt for their August 9 activities, and committed them to the Dane County Jail for seven days. Day and others continued to periodically leaflet at both malls as the "Family of Nu Parable," as "Disarmament Now" and as "Friends of The Bill of Rights." There were no further dances in the malls.

The trial on appellants' complaint took place in early January of 1985. On January 23, the court entered judgment permanently enjoining respondents "from performing in any way upon plaintiffs' property" and denying appellants' request for "nominal and compensatory damages." Appellants appealed from all of the judgment which "expressly or impliedly denies or fails to grant all of the relief requested. . . ."[1] Respondents cross-appealed, alleging infringement of their rights of free expression under Wis. Const. art. I, sec. 3.

---

[1] Appellants' petition for bypass was denied on November 5, 1985.

Appellants also moved to amend the judgment to enlarge the injunction to cover other expressive activities on its property. The court denied this motion and appellants filed a supplemental notice of appeal from that order.

## CONSTITUTIONAL QUESTION

Appellants argue that there is no need to reach a constitutional question in order to grant it full relief. They contend that Justice Rehnquist's statement in *Prune Yard Shopping Center v. Robins,* 447 U.S. 74, 81 (1980), that the Court could not "limit the authority of [a] State to exercise . . . its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution"[2] cannot be read as license for state courts to ignore the fourteenth amendment in construing their own constitutions. We agree, but note that *Prune Yard* sets the fifth amendment guarantee against taking property without just compensation and the fourteenth amendment guarantee against deprivation of property without due process of law, not as an absolute criterion, but as an upper limit on state constitutional liberties.

The first amendment recognizes certain expressional rights as an irreducible minimum guaranteed to all citizens against governmental infringement. The fifth and fourteenth amendments recognize the minimum property rights accorded to owners. The Supreme Court in *Prune Yard* permitted California to establish

---

[2] *See also State v. Doe,* 78 Wis. 2d 161, 171, 254 N.W.2d 210, 215 (1977) (Wisconsin may afford greater protection to the liberties of persons within its borders under the Wisconsin Constitution than is mandated by the fourteenth amendment).

expressional rights under its constitution more expansive than those guaranteed under the first amendment only because it determined that those rights did not transgress areas protected by the fifth and fourteenth amendments. Thus, that case confirms the existence of some space between these minima.

We conclude, therefore, that we may interpret art. I, sec. 3 of our state constitution within the bounds identified by the Supreme Court in *PruneYard*. Because the relief properly accorded appellants is inextricably interdependent upon the constitutional rights of respondents, we must establish the scope of those rights. The constitutional question is unavoidable.

## *STATE ACTION REQUIREMENT*

The first amendment contains an express state action requirement. It does not safeguard speech against limitations imposed by owners of private property. *Hudgens v. NLRB,* 424 U.S. 507, 513 (1976); *Harman v. La Crosse Tribune,* 117 Wis. 2d 448, 452, 344 N.W.2d 536, 539 (Ct.App.), *cert. denied,* —U.S.—, 83 L.Ed. 2d 9 (1984). The case at hand, however, involves only the free speech provisions of the Wisconsin Constitution.

The language of art. I, sec. 3 is significantly broader than that of the first amendment, providing that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. . . ." The first amendment contains no similar provision. We cannot conclude that the framers of the Wisconsin Constitution included this language for no purpose at all. As in the construc-

97

tion of statutes, we avoid reading a constitutional provision in such a manner as to render any portion of its language surplusage. *See Milwaukee Met. Sewerage Dist. v. DNR,* 122 Wis. 2d 330, 336, 362 N.W.2d 158, 161 (Ct.App. 1984). Therefore, we must determine whether this portion of art. I, sec. 3 prescribes rights of free expression beyond those accorded by the first amendment.[3]

---

[3] There is little consistency among the states that have ruled upon this or similar issues. This is true even among those states whose free speech provisions are worded identically to Wis. Const. art. 1, sec. 3. *See e.g. Shad Alliance v. Smith Haven Mall,* 488 N.E.2d 1211 (N.Y. 1985) (Refusing to abrogate state action requirement); *Alderwood Associates v. Washington Envir. Council,* 635 P.2d 108 (Wash. 1981) (Crossing state action barrier.) The following cases further illustrate this doctrinal split: jurisdictions retaining state action requirement, *Woodland v. Michigan Citizens Lobby,* 341 N.W.2d 174 (Mich. App. 1983), *aff'd,* 378 N.W.2d 337 (1985); *Cologne v. Westfarms Associates,* 442 A.2d 471 (Conn. 1982); jurisdictions finding constitutional protections against private infringements, *State v. Schmid,* 423 A.2d 615 (N.J. 1980); *Commonwealth v. Tate,* 432 A.2d 1382 (Pa. 1981); and *Robins v. PruneYard Shopping Center,* 592 P.2d 341 (Cal. 1979), *aff'd sub nom,* 447 U.S. 74 (1980).

Respondents suggest that *Denny v. Mertz,* 106 Wis. 2d 636, 318 N.W.2d 141, *cert. denied,* 459 U.S. 883 (1982), *Augustine v. Anti-Defamation Lg. B'nai B'rith,* 75 Wis. 2d 207, 249 N.W.2d 547 (1977), and *Milwaukee E. R. & L. Co. v. Pallange,* 205 Wis. 126, 236 N.W. 549 (1931), illustrate the Wisconsin Supreme Court's willingness to apply the state constitution's free speech provisions in a wholly private context. The *Pallange* and *Denny* cases were private civil defamation actions and the *Augustine* case was an action for tortious interference with contract. Because art. 1, sec. 3 provides that "[e]very person . . . [is] responsible for the abuse of . . ." his right to "freely speak, write and publish," these cases recognize only that *abused* expressional rights might not be accorded constitutional

Appellants cite *Lawson v. Housing Authority*, 270 Wis. 269, 274, 70 N.W.2d 605, 608, *cert. denied* 350 U.S. 882 (1955), for the proposition that "[sec.] 3 . . . art. I of the Wisconsin constitution, guarantee[s] the same freedom of speech . . . as do the First and Fourteenth amendments of the United States constitution." Appellants argue that a coordinated reading of *Hudgens* and *Lawson* compels the conclusion that free speech rights under the Wisconsin Constitution cannot be interpreted more expansively than those accorded by the federal Bill of Rights. Accordingly, they maintain, art. I, sec. 3 also does not protect speech activities against purely private infringements. Respondents do not contest the absence of state action in the case at hand. Thus, appellants contend, there is no litigable issue under the Wisconsin Constitution.

*Lawson* does not require that result. That case, involving a constitutionally suspect resolution of the City of Milwaukee Housing Authority, plainly implicates only state action. Certainly as to governmental infringements of speech, the Wisconsin and federal constitutional protections are essentially coextensive. *Lawson* says as much. "If Resolution 513 violates [the first] amendment it follows as a necessary corollary thereof that it also violates either sec. 3 or 4, art. I of the Wisconsin constitution, or both." *Id.* at 282, 70 N.W.2d at 612. However, the case nowhere holds that state action is a threshold requirement of subject matter jurisdiction under Wis. Const. art. I, sec. 3.[4]

protections. These cases create no constitutional causes of action, and cannot be read as broadly as respondents' urge.

[4] *Lawson* also predates the Supreme Court's pronouncements in *PruneYard* by some 25 years.

Appellants also note that the Wisconsin Supreme Court in *Pauly v. Keebler,* 175 Wis. 428, 430–31, 185 N.W. 554, 556 (1921), and in cases following, said that the Wisconsin Constitution's declaration of rights is "a substantially equivalent limitation of legislative power" to the federal Bill of Rights. Given the language of Wis. Const. art. I, sec. 3, providing that "no laws shall be passed to restrain or abridge the liberty of speech or of the press," we cannot help but agree. The minimum protection accorded by art. I, sec. 3 cannot be any less than that accorded by the first amendment. However, a state's constitutional protections of free expression may be greater than those provided under the first amendment. *PruneYard,* 447 U.S. at 81. *Pauly* confirms the lower bound of protection, but does not establish an upper limit.

The Wisconsin Constitution should be interpreted "in the light of the circumstances and discussions which led to its adoption, and similar provisions existing in other state constitutions at the time, as well as subsequent adjudications upon the meaning of the words employed." *The Wisconsin Central Railroad Co. v. Taylor County and others,* 52 Wis. 37, 95, 8 N.W. 833, 855 (1881). There was no debate on the free speech provision at either the 1846 or 1848 Wisconsin constitutional convention. Therefore, the journals of the conventions provide no clues as to the source of or intent of the framers regarding this section. We note, however, that the central emphasis of the preamble to the Wisconsin Constitution is the freedom of the people and the protection of their liberties. The establishment of government is given only secondary emphasis. "By the preamble, preservation of liberty is given prece-

dence over the establishment of government." *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 532, 90 N.W. 1098, 1099 (1902).

However, the wording of art. I, sec. 3 is identical to that added to the New York Bill of Rights in 1821.[5] The Reports of the Proceedings and Debates of the 1821 New York constitutional convention indicate that its free speech provision was intended by its drafters to function only as a check on governmental conduct.

The New York Court of Appeals recently held in a case factually similar to the one at hand that "discernment of the reach of the mandates of our State Constitution, precludes us from casting aside so fundamental a concept as State action. . . ." *Shad Alliance v. Smith Haven Mall,* 488 N.E.2d 1211, 1217 (N.Y. 1985).[6] Because Wisconsin's free speech provision was apparently modeled after New York's, we should give this construction great weight. *Bablitch & Bablitch v. Lincoln County,* 82 Wis. 2d 574, 577, 263 N.W.2d 218, 221 (1978). Simultaneously, however, we should not adopt New York's construction of its own constitution if we conclude that the better rule would be a different construction. *B.F. Sturtevant Co. v. Industrial Comm.,* 186 Wis. 10, 17, 202 N.W. 324, 326 (1925).

---

[5] N.Y., Const., art. 1, sec. 8 (1821).

[6] The New York Court of Appeals appears to reach this conclusion less on the basis of interpretation of its constitution's language and more in terms of the notion that "State action is a crucial foundation for both private autonomy and separation of powers. . . ." *Shad Alliance,* 488 N.E.2d at 1216. The court also noted a consistent history of reaffirmation of the state action requirement in its past decisions.

There is no language in the first clause of Wis. Const. art. I, sec. 3 which limits the protection of free expression only from the acts of state government. It is difficult, if not impossible, to reconcile our duty to give this provision full meaning with the state action restriction urged by appellants.

Further, a hidebound requirement of state action poses a number of difficult problems. First, we do not think that the fourteenth amendment directs us to abandon the safeguards envisioned in the fundamental principles of a two-tiered, state/federal system of government. "[With] two distinct governments . . . a double security arises to the rights of the people." A. Hamilton or J. Madison, *The Federalist* at 266 (M. Beloff ed. 1948). If we were to conclude that a state action requirement exists in Wis. Const. art. I, sec. 3, its protections would be wholly coextensive with those of the first amendment. Under that construction, the fourteenth amendment would downgrade the double protection of basic liberties envisioned in classical federalism to but a single level of security.

Second, while the fourteenth amendment's jurisdictional prerequisite may be construed as maintaining the traditionally independent police powers of the separate state sovereigns in the federal system, this rationale fails to justify a state action requirement in state constitutions. Because Wisconsin denies essential governmental autonomy to its subordinate political units, a state action doctrine cannot be vindicated here as safeguarding a microcosmic federalism.

We conclude, therefore, that Wisconsin's Declaration of Rights provides a freedom of expression compli-

mentary to—not coextensive with—that afforded by the federal Bill of Rights. This right of speech guaranteed by the Wisconsin Constititution is protectable both against governmental and public bodies but also, under certain circumstances, against private entitles as well.

Appellants contend that this result cannot be reached without a companion conclusion that sec. 943.13(1)(b), Stats. (1981)[7] which subjected anyone to fine and imprisonment who "[e]nters or remains on any land of another after having been notified by the owner or occupant not to enter or remain on the premises" is unconstitutional. We disagree.

A statute attacked as unconstitutional must affect the litigant in some way. *State v. Holmes,* 106 Wis. 2d 31, 38, 315 N.W.2d 703, 707 (1982). Wisconsin's trespass statute is not implicated in the civil case at hand. We do not create a constitutional defense to criminal liability for trespass here because no such liability has been alleged.

Given an appropriate criminal trespass case, however, such a defense could be created without invalidating the statute. All statutes are presumed constitutional. *In Matter of Guardianship of Nelson,* 98 Wis. 2d 261, 266, 296 N.W.2d 736, 738 (1980), and we must uphold a statute where we can. *State ex rel. Chobot v. Circuit Court,* 61 Wis. 2d 354, 367, 212 N.W.2d 690, 696–97 (1973). Therefore, a criminal statute may be

---

[7] At the time of Nu Parable's performance at East Towne, sec. 943.13(1)(b), Stats., made trespass to land a crime. Section 6, 1983 Wis. Act 418, effective October 1, 1984, changed the penalty to a forfeiture.

construed, without invalidating it, in such a way that is not applied in a violation of a citizen's constitutional rights. *Id.* at 359, 212 N.W.2d at 693.

Private property rights may be reasonably regulated to promote the public welfare. *Just v. Marinette County,* 56 Wis. 2d 7, 15, 201 N.W.2d 761, 767 (1972). We believe this concept underlies sec. 943.13(1)(b), Stats. (1981), and, in the proper case, could limit the owner or occupant's statutory right to exclude.

### THE BALANCING OF COMPETING INTERESTS

Private property is always held subject to the state's police power, *Eggebeen v. Sonnenberg,* 239 Wis. 213, 218, 1 N.W.2d 84, 86 (1941), and its use may be reasonably regulated, within constitutional bounds, in the interest of the public welfare. *Just,* 56 Wis. 2d at 15, 201 N.W.2d at 767; *PruneYard, supra,* 447 U.S. at 81. A number of courts have found that such restrictions may be reasonably imposed on certain property use in order to protect rights of free expression. *See e.g., State v. Schmid,* 423 A.2d 615 (N.J. 1980); *Robins v. Prune-Yard Shopping Center,* 592 P.2d 341 (Cal. 1979), *aff'd sub nom* 447 U.S. 74 (1980). We are persuaded to do likewise.

However, free speech rights are also subject to reasonable regulation, *State v. Zwicker,* 41 Wis. 2d 497, 510, 164 N.W.2d 512, 518, *appeal dismissed,* 396 U.S. 26 (1969), and the elimination of the state action barrier by no means renders those rights absolute. Therefore, we must strike the best balance within this constitutional framework between recognized interests in

the private property and the interest in free expression exercised upon such property.

The greatest advantage of such direct balancing is its adaptability to changing circumstances and socio-economic conditions.[8] This flexibility is important in keeping the Wisconsin Constitution vital. The Wisconsin Supreme Court in *Borgnis v. Falk Co.*, 147 Wis. 327, 349-50, 133 N.W. 209, 215-16 (1911), noted that:

> When an eighteenth century constitution forms the charter of liberty of a twentieth century government must its general provisions be construed and interpreted by an eighteenth century mind in light of eighteenth century conditions and ideals? Clearly not. . . .
>
> [T]he changed social, economic and governmental conditions and ideals of the time, as well as the problems which the changes have produced, must also logically enter into the consideration, and become influential factors in the settlement of problems of construction and interpretation.

However, we must also be mindful of two important disadvantages of the balancing approach. First, guidance to lower courts and citizens concerning what kind of speech activities and property interests are likely to prevail is initially uncertain, creating the potential for a surge of litigation. Second, there is the appearance of a reallocation of a traditionally legislative function to the courts. We do not believe either disad-

---

[8] It is unlikely that the modern diversion of a substantial proportion of public trade and traffic from the town square to privately owned, enclosed, suburban shopping malls was an event foreseen by the framers of the Wisconsin Constitution.

vantage is fatal to our choice of the balancing approach here.

First, the general contours of our decisional process can be framed in terms of a multi-factor test. The process will quickly become both clearer and established as precedent as the law is applied in a few subsequent cases. Our review of the case law in those states which have adopted balancing tests has not disclosed a "floodgates" problem caused by the choice of that analysis.

Second, we are well aware that the courts of Wisconsin lack both the constitutional authority and the functional capacity to fulfill a legislative role. However, the full protection of constitutional rights has always relied more upon the judiciary's powers than on statutory protections. This is so in the free speech context because legislatures, as majoritarian institutions, rarely provide adequate safeguards for the expression of potentially unpopular minority views. " 'Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence. . . .' " (Citation omitted.) *Schmid,* 423 A.2d at 627.

Further, the people—through the Legislature— are ultimately capable of influencing the outcome of cases such as the one at hand. The legislature may establish statutory presumptions regarding those nonconstitutional elements contributing to a result in a given case. Additionally, the Wisconsin Constitution, despite its status as a fundamental charter of governmental powers and private rights, is readily susceptible to amendment or revision in response to public mandate. Wis. Const., art. XII, secs. 1 and 2.

Several other state courts have weighed conflicting speech and property rights and struck a functional

106

balance between them. *Schmid, supra; Commonwealth v. Tate,* 432 A.2d 1382 (Pa. 1981); and *Alderwood Assoc. v. Wash. Envir. Council,* 635 P.2d 108 (Wash. 1981). The *Alderwood* approach is somewhat confusing and has been criticized both for its logical inconsistencies and the sharp 4–1–4 split of the court. *Tate* adopts the *Schmid* analysis.

The balancing test crafted by the Supreme Court of New Jersey in *Schmid* is noteworthy.[9] That court

> derive[d] some guidance from certain of the Supreme Court cases, such as *Marsh v. Alabama,* [326 U.S. 501 (1946)], *Lloyd Corp. v. Tanner,* [407 U.S. 551 (1972)], and *PruneYard Shopping Center v. Robins, supra,* which recognize generally that the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property.

*Id.,* 423 A.2d at 629–30. The *Schmid* court evolved a multi-factor test to determine the extent to which the use of private property could be restricted to accommodate the rights of free speech exercised upon it. That test weighed "(1) the nature, purposes, and primary use of such private property, generally, its 'normal' use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional

---

[9] The *Schmid* case, like *Tate,* limits its analysis to the property of a private university. However, New Jersey courts have since applied the *Schmid* balancing test in *Bellemead Dev. Corp. v. Schneider,* 472 A.2d 170 (N.J. Super. Ct. Ch. Div. 1983); and *Brown v. Davis,* 495 A.2d 900 (N.J. Super. Ct. Ch. Div. 1984), to expressional activities on the grounds of a private office building and a private abortion clinic, respectively.

activity undertaken upon such property in relation to both the private and public use of the property." *Id.* at 630. The *Schmid* court also suggested that any suitable time, place and manner restrictions imposed by the property owner should be included in the Another factor suggested in *Schmid* also warrants inclusion: the availability of alternative media and fora for the exercise of the expressive activity.

The *Schmid* test accounts for all of the factors we deem important to the resolution of the case before us. We adopt it.

(1) *"Normal" Use of The Property*

■

Our analysis begins with an examination of the primary, "normal" use of the private property in question: the East Towne and West Towne Malls. The trial court, in ruling on the permanent injunction, said:

> The plaintiffs are in business to make a profit and their profit is derived primarily from leasing space to the mall stores and from deriving a percentage of revenue based upon the volume of sales of each of the mall stores. In order to attract customers into the mall, the plaintiffs spent a great deal of money and effort to promote the mall by the establishment of walkways, fountains, greenery and seating, all in the common area, in an effort to create an attractive, restful and non-disruptive atmosphere which would hopefully put the shoppers in a mood to patronize the mall stores. In addition, the plaintiffs, together with the Merchants Organization, put on various promotions in an effort to attract shoppers to the mall. These attractions fall into three categories. In the first category are attractions which the merchants themselves pay for.

This includes entertainment such as magicians, soap stars and celebrities. In the second category are attractions which the sponsor of those attractions pay to be allowed to produce. These consist of, for example, antique auto shows, boat shows and floral shows. In the third category fall such attractions as girl scout displays and fashion shows which are shown at no cost to the merchants or to the people putting on the attractions. The purpose of such attractions is to draw customers and hopefully put them in the mood to spend money at the mall stores.

These findings are amply supported by the record and are not clearly erroneous. *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct.App. 1983).

Some state courts have labeled shopping malls the functional equivalent of public property. We cannot go that far in this case. There is some evidence that appellants' management initially characterized the malls as "community centers" and that a portion of regular traffic is unrelated to shopping. This evidence of limited *public* uses propels the East and West Towne Malls some distance along the *Marsh* continuum requiring increasing accommodation of the individual rights of the public on these premises. However, the malls' primary use here is in no sense the functional equivalent of public sidewalks or the traditional town square.[10]

---

[10] Though the malls are configured in such a way as to make shopping convenient and comfortable, there is no contention that they simulate the appearances of a public sidewalk. They are enclosed and, in places, carpeted; characteristics which readily distinguish them from publicly owned property. *See Moreland Corp. v. Retail Store Employees Union,* 16 Wis. 2d 499, 504–05, 114 N.W.2d 876, 879 (1962) ("If . . . the property involved is a multi-store shopping center, *with sidewalks simulated so as to appear to be public*

The trial court's characterization paints a fundamentally accurate picture of the properties' "normal use."

(2) *Nature of Public Invitation*

The record shows that the nature of appellant's invitation to the public to enter and use the shopping malls largely parallels the primary use to which the property is put. That is, advertising invites the public into the malls primarily to patronize the tenant stores. The trial court also found what could be called a "negative invitation" in the form of a "firm policy" of prohibiting political campaigning, religious activities, soliciting and the distribution of handbills in the mall. These findings are not clearly erroneous. *Noll,* 115 Wis. 2d at 643, 340 N.W.2d at 577.

However, there is nothing in the record to show that the essence of these invitations and prohibitions was express. Nor is there evidence that appellants actively excluded persons seeking to enter the mall for purposes other than shopping if those purposes were not among those prohibited by management. However, even though a large-scale public presence is essential to the realization of appellants' commercial ends, the record does not demonstrate the existence of an open, unqualified invitation to the public, either express *or* implied.

---

*in nature,* we would have no difficulty in reaching a conclusion that the property rights of the shopping-center owner must yield to the rights of freedom of speech and communication. . . ." *Id.* at 505, 114 N.W.2d at 879. (Emphasis added.))

### (3) *Relation of Nu Parable Dance to Other Mall Use*

This factor raises the question of whether respondents' expressional activities are incompatible in any sense with both the private and public uses of the shopping malls. That is, is there anything in the record to suggest that respondents' performance was discordant with appellants' professed commercial goals or the use of their property to those ends?[11]

We have concluded that the trial court correctly found that the primary use of appellants' property was to promote the patronage of the tenant stores. They encourage this effect through a significant investment in the maintenance of pleasant surroundings, promotional activities and various forms of entertainment. Thus, the effects of both the style and content of respondents' expressional activity on mall patronage must be considered.

Respondents' professed purpose in performing its dance is to convey a thought-provoking image of the horrors of nuclear warfare. The dance concludes with a "die-in," when spectators are invited to join the dancers in crumpling to the floor. Appellants' central concern is that this performance is substantially unlike other activities within the malls. They contend that it disturbs and drives away shoppers the malls were created to attract. The trial court agreed, finding that—

---

[11] The determination required is whether the expressional activities are discordant with the *use* of the property and not whether they are discordant with the owner's desires or beliefs. *Bellemead Dev. Corp. v. Schneider,* 472 A.2d 170, 177 (N.J. Super. Ct. Ch. Div. 1983).

on balance—appellants had successfully shown that the Nu Parable dance interfered with the use and harmed the economic value of their private property.

Review of this determination implicates mixed questions of fact and law. We apply a "clearly erroneous" standard to the factual portion of the court's determination. *Noll,* 115 Wis. 2d at 643, 340 N.W.2d at 577. The connected questions of law we review independently. *Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

The trial court found that when respondents performed at the East Towne Mall on Thursday, August 9, 1984, they "created a definite economic impact . . . upon the mall merchants who were in proximity of the performance, which in turn caused an economic impact upon the [appellants.]" The court based this finding upon the testimony of a number of East Towne store managers to the effect that their sales for August 9 were depressed below average daily receipts by varying, but identifiable, amounts.[12] It noted that none of

---

[12] The record contains the following evidence: the manager of a store known as "16 Plus" testified that the store is located near the point where appellants performed and that her sales for Thursday, August 9, 1984, were approximately $750 lower than the daily average for the week and approximately $742 lower than the average daily sales for the seven Thursdays preceding and the four Thursdays following August 9; the manager of "Susie's Casuals," another store located near the dance, testified that her sales for August 9, 1984, were approximately $200 below average; the manager of the Kinney Shoe Store, located adjacent to Susie's Casuals, testified that his sales for August 9, 1984, were approximately $655 below the daily average for the week and approximately $674 below the daily average for the three Thursdays preceding and the three Thursdays following August 9; and the supervisor of Naturalizer

those witnesses could give an explanation other than the performance of the dance to account for this adverse effect. The court found this testimony credible, and also admitted into evidence bookkeeping records documenting these dips in sales.

Respondents suggest that the depressed sales on August 9, 1984, could just as easily be attributed to the presence of mall security guards and Madison Police officers during and after the dance. However the record contains no evidence to support this argument.

Appellants also introduced the results of a number of recent public opinion studies—one conducted in the Madison market—to show that shopping mall activities by special interest groups actively discourage shoppers from entering or remaining in the malls.[13] Respondents do not challenge the admissibility of this

Shoes, which adjoins Kinney's, testified that her sales for August 9, 1984 were approximately $318 lower than the daily average for the five Thursdays preceding and the three Thursdays following August 9.

[13] The results of the Gard Associates telephone survey, taken in Madison during September 1984, report that, if special interest groups were to demonstrate frequently in East Towne Mall, 33.3% of the respondents would shop at the mall less often, and 43.1% would be very likely to avoid the mall altogether. The figures for West Towne were comparable.

A Bloomfield Hills survey conducted in October 1982 in the Hartford, Connecticut area reported that if a special interest group were to solicit signatures on a petition within a shopping mall, about 22% of the respondents would be "very likely" or "somewhat likely" to spend less time and money in the mall, and 43.5% indicated they would be "very likely" or "somewhat likely" to avoid the areas of the mall where the solicitation was taking place.

evidence, but mount an extensive attack on both the reliability of the surveys and the conclusions drawn from them.

We are mindful of the many faults and limitations of public opinion research. Nevertheless, such limitations go only to the weight and credibility such evidence is to be given. Here the trial court—as factfinder—chose to give the results of these studies some weight. We defer to its decision to do so. *State v. Higginbotham,* 110 Wis. 2d 393, 405, 329 N.W.2d 250, 256 (Ct.App. 1982).

The record contains ample, substantially uncontroverted evidence to support the court's finding that the August 9 dance adversely affected sales at East Towne. We conclude, therefore, that this finding is not clearly erroneous. *Noll,* 115 Wis. 2d at 643, 340 N.W.2d at 577. Because appellants have demonstrated an impairment of the use and value of their property, this case distinguishes itself from many of the factually similar cases in other states.[14]

The conclusion is unavoidable that the Nu Parable dance was disruptive to the primary use of appellants' property and was not related in any way to appellants' limited public invitation to shop on its property. It is possible, therefore, that respondents' conduct rises to the level of an abuse of their free speech rights for which they are responsible under art. 1, sec. 3. However, appellants do not make this argument and we

---

[14] The Supreme Court in *PruneYard,* for example, noted that there was *no* evidence "to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value or use of their property as a shopping center." *PruneYard,* 447 U.S. at 83.

will not consider it here. *Dumas v. State,* 90 Wis. 2d 518, 523, 280 N.W.2d 310, 313 (Ct.App. 1979).

(4) *Time, Place and Manner Restrictions*

Though we have said that an owner of private property may be constitutionally obligated under certain circumstances to honor the free speech rights of others, his private property and free speech rights must also receive a measure of protection. *PruneYard,* 447 U.S. at 81. Therefore, the owner of such property is entitled to impose reasonable rules and conditions for the individual exercise of expressional rights upon that property.

Appellants contend that recognition of respondents' free speech rights on private property under Wisconsin's constitution would necessarily deny appellants' rights under the first, fifth and fourteenth amendments. We disagree. Private property rights are no more absolute under our constitutions than the rights to free expression. *See In Re Schroeder Hotel Co.,* 86 F.2d 491, 494 (7th Cir. 1936) (Rights under constitution and its amendments must be exercised with reasonable regard for conflicting rights of others, and there is no right so absolute that it may be exercised under any circumstances and without qualification). We conclude that properly crafted time, place and manner regulations can accommodate free expression while affording an owner's property interests ample protection.

However, appellants also assert that respondents' access to the malls might impair the mall owners' own first amendment rights. They argue that the state may

115

not force one person to subsidize another's exercise of free speech and suggest that mall patrons might attribute respondents' political message to appellants.

The United States Supreme Court in *PruneYard* noted that *Wooley v. Maynard,* 430 U.S. 705, 717 (1977)—stating the rule that persons have a first amendment right not to help at their expense to spread a message with which they disagree—was distinguishable on several grounds. *First, Wooley* was a case in which the government prescribed the specific message required to be displayed on the appellant's private property. Where no such message is dictated, there is no danger of governmental discrimination for or against a particular message. *Second,* the shopping mall is not property held for the personal use of appellants, it is open to the public. Thus, it is less likely that public speech there will be identified with the owners. *Finally,* the Court held that the mall owners were free to "expressly disavow any connection with the message by simply posting signs in the area where the speakers for handbillers stand." *PruneYard,* 447 U.S. at 87. A number of these factors (and the *PruneYard* thesis in general) were again considered in *Pacific Gas & Elec. v. California P.U.C.,* — U.S. —, 89 L.Ed. 2d 1 (1986), and appear vital. They also appear applicable to the case at hand.

Appellants argue, however, that the results of Dane County, Flint, Michigan, and Hartford, Connecticut public opinion studies demonstrate that more than 25% of the surveyed shoppers identify speech activities within a shopping center with its owners. Nonetheless, the record contains no evidence that any mall patron mistook the Nu Parable dance for a demonstration of appellants' political views. Nor do these studies ac-

count for the potential effects of dissociative signs or statements, or other reasonable time, place and manner restrictions which could identify the message as the speaker's alone. The minimal burden of such regulation or disassociative activity, where necessary, appears commensurate with an owner's accomodation of individual rights—required by *March, Lloyd Corp.,* and *PruneYard*—upon the private property he opens to the public.

Respondents argue that appellants' existing scheme of screening and accomodating shows, displays and promotions amounts to time, place and manner regulation, and that it has proven successful in protecting their commercial interest.[15] We agree. Because appellants retain the full right to reasonably regulate the use of their properties, their first, fifth and fourteenth amendment rights are adequately protected and not actionably infringed by our recognition of a right of free speech on that property.

---

[15] Respondents argue, however, that appellants failed to protect their own interests by imposing time, place or manner restrictions on the Nu Parable dance or any other expressive activity. Thus, they contend, appellants cannot claim injuries which such rules could have prevented. We are not convinced that this is so. The record shows that when Mr. Major first approached mall management in March, 1984, Assistant Mall Manager Vander Wielen refused permission for an independent performance, but suggested that Nu Parable might participate in a scheduled mall event—a dance anthology—in September, 1984. We believe this "counter-offer" can be reasonably construed to apply time, place and manner restrictions. We do not reach the issue of whether these restrictions were constitutionally reasonable, but note that the record shows that respondents were unwilling to perform under those conditions.

### (5) *Alternate Communications Channels*

Finally, we consider whether there exist feasible and convenient alternative means by which appellants could meaningfully engage in the same expressional activities. The *Schmid* court noted that

> [w]hile the presence of such alternatives will not eliminate the constitutional duty, it may lighten the obligations upon the private property owner to accommodate the expressional rights of others and may also serve to condition the content of any regulations governing the time, place and manner for the exercise of such expressional rights.

*Schmid,* 423 A.2d at 630.

The record shows that Nu Parable has had a fairly extensive history of public performances. Its first performance occurred at a United States post office in Madison as part of a "tax day rally" in April, 1984. Subsequently, the group danced at a public park off the State Street Mall in Madison; in the State Capitol Rotunda; on the steps of the city-county building in Madison; atop Bascom Hill, on the Library Mall, in Camp Randall Stadium and in the Memorial Union at the University of Wisconsin; on the grounds of East and West High Schools in Madison; at the Dane County Airport terminal; at the Madison Civic Center; and at two locations in Wausau.

We take judicial notice of the fact that a number of these sites have, over the years, become traditional fora for the expression of ideas, public discourse and debate. *Frederick v. Hotel Investments, Inc.,* 48 Wis. 2d 429, 433, 180 N.W.2d 562, 564 (1970) (Judicial notice may be taken of matters of common knowledge). The

118

preeminent role certain of these fora play in public discourse in the Madison community may make the significant weight we accord this factor unique to the case at hand. The malls here are not the functional equivalent of a town square.

The record also contains extensive evidence regarding the various mass media potentially available to respondents in Dane County.[16]

The audiences reachable through any of these channels might not be as numerous or concentrated as those available in a shopping mall environment. Nonetheless, because of the number and pervasiveness of these channels, we conclude that respondents' ability to publicly communicate their message is not foreclosed or even seriously limited by either the enforcement of the injunction or reasonable regulation of mall access for expressive activities other than "performance."

Our review of the preceding five factors convinces us that the balance tips in favor of appellants' asserted property rights. The Nu Parable performance has demonstrably conflicted with and impaired the primary use and value of appellants' private property. Further, there exist adequate alternate channels and fora for respondents' expressive activities. Therefore, respondents were properly enjoined.

---

[16] It identifies four television broadcasting stations, several cable television public access channels, 16 radio stations, two daily newspapers, more than 20 weekly newspapers, over 10 local magazines, and area signs and billboards.

Appellants challenge the court's refusal to amend the judgment to enlarge the injunction to cover expressional activities beyond "performances" on their property.[17] They express concern that other forms of expressional activity by respondents pose a threat of harm to their property interests similar to that demonstrated in connection with the Nu Parable dance.

The grant or denial of injunctive relief is within the trial court's sound discretion and will not be reversed on appeal without a showing of an abuse of discretion. *Mercury Record v. Economic Consultants,* 91 Wis. 2d 482, 500, 283 N.W.2d 613, 622 (Ct.App. 1979). "To find an abuse of discretion [we must determine] either that discretion was not exercised or that there was no reasonable basis for the trial court's decision." *Wisconsin Public Service Corp. v. Krist,* 104 Wis. 2d 381, 395, 311 N.W.2d 624, 631 (1981).

In denying appellants' motion, the court noted that all the evidence received at trial

> was directed to whether or not the Nu Parable people should be allowed to perform in the malls, and the Court decided . . . that they should not be. . . .
>
> Now, I did not concern myself with leafletting or petitions, and I had no reason to do so. . . . [These] matters are now being pursued, at least in part, in another branch of the Circuit Court . . .

---

[17] Appellants suggest that the relief granted by the permanent injunction should parallel that of the temporary injunction: that respondents, or anyone acting in connection with them, be barred from entering appellants' properties except as a customer or shopper.

> The court believes it would be a much more orderly process to continue pursuing your requested relief in the other branches of the Circuit Court.

We conclude that the court exercised its discretion. We now must determine whether there was a reasonable basis for its decision.

■

Injunctive relief is to be tailored to the necessities of the particular case. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61 (1975). This is especially true regarding permanent injunctions. Here, though the record discloses evidence of continued leafletting by individuals other than respondents, appellants' proof of actual economic impact was linked wholly to respondents' August 9, 1984, dance at East Towne Mall.

Further, the case brought by appellants against Samuel Day, et al., was then pending in another branch of the circuit court. That case dealt directly with leafletting and other forms of non-dance expression. The defendants in that case were among those identified as working "in concert with" respondents in the instant case.

We may not substitute our discretion for that of the trial court. *Barrera v. State,* 99 Wis. 2d 269, 282, 298 N.W.2d 820, 826 (1980), *cert. denied,* 451 U.S. 972 (1981). We may, however, search the record for reasonable bases sufficient to sustain the court's decision. *Loomans v. Milwaukee Mut. Ins. Co.,* 38 Wis. 2d 656, 662, 158 N.W.2d 318, 320 (1968). Given the factors noted above, we conclude that the record provides a reasonable basis for the court's decision. It did not abuse its discretion by limiting injunctive relief to the established threat.

121

■

Finally, appellants contend that the trial court erred by refusing to entertain contempt proceedings against Samuel Day arising from his distribution of handbills in East Towne Mall on June 20, 1984. This is so, they argue, because Day thereby violated the temporary injunction ordered by the court,[18] and because "[n]ormally, the order to show cause [in a contempt matter] should be filed in the same action in which the order allegedly violated was filed." *Dalton v. Meister,* 84 Wis. 2d 303, 309, 267 N.W.2d 326, 329 (1978).

The exercise of a court's contempt power is discretionary. *In re Paternity of D.A.A.P.,* 117 Wis. 2d 120, 127, 344 N.W.2d 200, 203 (Ct.App. 1983). We will not upset the court's decision to dismiss a contempt proceeding unless the court's discretion was not exercised or there is no reasonable basis for the court's decision. *Krist,* 104 Wis. 2d at 395, 311 N.W.2d at 631.

The transcript of the contempt hearing shows that the court was seeking to limit the issues at trial. It said:

---

[18] Appellants contend that Day's leafletting activities were "under [the] direction or control or in concert with . . ." appellants under the terms of the June 1, 1984, temporary injunction. The record shows that Day knew Robert Major, that he helped plan at least one rally at which Nu Parable performed, that he advised and encouraged the troupe, and that he distributed leaflets at East Towne Mall on behalf of "Friends of Nu Parable."

Day is not a party to this action. In declining to enforce the temporary injunction against Day, the court suggested that a separate action be commenced against him. Appellants subsequently did so.

We've got one action against Robert Major and Nu Parable, which hopefully is proceeding to trial. The Court has ruled that it's illegal to distribute pamphlets, as Mr. Day and other people are doing at East Towne or West Towne. That has nothing to do with Major or Nu Parable. If Mr. Day or anybody else out there distributing pamphlets [sic], there's a restraining order against him. . . .

I just can't see why you have to allege the "in concert" theory when you've got an individual who is restrained from doing this, that you can bring into court . . . it's cluttering up the case that we have going against Major and Nu Parable.

I still feel . . . that the proper procedure would be for you to start [a] separate action . . . against Sam Day . . . and bring him into this court or any other court seeking contempt for violation of the restraining order. . . .

It is apparent that the court exercised its discretion. We now must determine whether the basis for its decision was reasonable.

The record discloses evidence of substantial leafletting activity in the malls by more than a dozen individuals on a number of occasions after entry of the restraining order and temporary injunction. The potential existed for a large number of contempt motions. Because contempt power should be used only after great deliberation, *State v. Braunsdorf,* 98 Wis. 2d 569, 587, 297 N.W.2d 808, 816 (1980), the court could reasonably have perceived the potential for extensive collateral contempt proceedings as a genuine threat to the prompt and orderly determination of the central issues in the case before it.

We may not substitute our discretion for that of the trial court. *Barrera,* 99 Wis. 2d at 282, 298 N.W.2d

at 826. Because there was a reasonable basis for the court's disposition of the Day contempt motion, we sustain the court's decision.

*By the Court.*—Judgment affirmed.

GARTZKE, P.J. (concurring). I conclude that the free speech provisions in Wis. Const. art. I, sec. 3, are intended to protect persons only from state action. Because the plaintiff mall operators are private persons and the malls are privately owned, the defendants have no constitutional right to exercise free speech on the malls. The plaintiffs have a common law right generally to prevent other persons from trespassing on the malls. Since the defendants persist in trespassing on the malls, the plaintiffs are entitled to an injunction.

The constitutional provision at issue is the third section of the Declaration of Rights in the Wisconsin Constitution, art. I, sec. 3, which provides:

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

That Wisconsin may grant greater constitutional rights to persons within its borders than does the United States Constitution is well established. Both the United States Supreme Court and the Wisconsin Supreme Court recognize this principle. That Wiscon-

sin may endow private persons with state constitutional rights enforceable against other private persons is equally well established.

The question before us is more limited. The question is whether Wis. Const. art. I, sec. 3, as adopted in 1848, grants private persons a right of free speech enforceable against other private persons.[1] Only if we affirmatively resolve that question do we reach the issue of reasonable restrictions on the exercise of that right.

We cannot resolve the question by deciding whether it is good public policy to give private persons a right of free speech enforceable against other private persons. We "are not obliged to explain that what is constitutional is also good, nor that everything good also is constitutional." Linde, *E Pluribus— Constitutional Theory and State Courts,* 18 Ga. L. Rev. 165, 180 (1984).

Nor does the answer lie in how the United States Supreme Court has interpreted the first amendment to the United States Constitution, which prohibits Congress from "abridging the freedom of speech." Although the first amendment creates no constitutional right of

---

[1] The issue was raised but not resolved in *State v. Horn,* 126 Wis. 2d 447, 377 N.W.2d 176 (Ct.App. 1985). The *Horn* defendants were prosecuted for having entered an abortion clinic to encourage patients not to have abortions. They argued that their criminal trespass convictions violated their state constitutional rights to freedom of speech. We found it unnecessary to decide whether the Wisconsin Constitution will ever protect free speech from private interference. We merely declined to extend the speech protection to trespass on property belonging to a small private medical clinic. *Id.* at 453, 377 N.W.2d at 179. In *Prahl v. Brosamle,* 98 Wis. 2d 130, 151, 295 N.W.2d 768, 780–81 (Ct.App. 1980), we held that a television cameraman had no first amendment privilege to trespass on private land to gather news.

free speech enforceable by private persons against each other, *Hudgens v. NLRB,* 424 U.S. 507, 518–19 (1976), state constitutions may do so. *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81 (1980). *See McCauley v. Tropic of Cancer,* 20 Wis. 2d 134, 139, 121 N.W.2d 545, 548 (1963) (state may permit greater freedom of speech than federal constitution requires).

The answer lies in the proper interpretation of Wis. Const. art. I, sec. 3. Constitutional interpretation, like statutory interpretation, is a question of law, a task for the courts. *State ex rel. Zimmerman v. Dammann,* 201 Wis. 84, 88–89, 228 N.W. 593, 595 (1930).

The Wisconsin Supreme Court has articulated the analysis which every court must use when interpreting a provision in the Wisconsin Constitution. *State v. Beno,* 116 Wis. 2d 122, 136, 341 N.W.2d 668, 675 (1984). The analysis requires a court first to examine the plain meaning of the words in the context used. If the meaning is not plain, the court then makes an historical analysis of the constitutional debate and of the practices in 1848 which may reasonably be presumed were known to the framers of the 1848 constitution. The next step is to examine the earliest legislative interpretation of the provision as manifested in the first law passed following adoption of the constitution. *Id.* at 136–37, 341 N.W.2d at 675; *Buse v. Smith,* 74 Wis. 2d 550, 568, 247 N.W.2d 141, 149 (1976); *Board of Education v. Sinclair,* 65 Wis. 2d 179, 182–84, 222 N.W.2d 143, 145–46 (1974). If these rules of constitutional interpretation do not provide an answer, the court may look to the objectives of the framers in adopting the provision. *Beno,* 116 Wis. 2d at 138, 341 N.W.2d at 676.

The *Beno* court dealt with Wis. Const. art. IV, secs. 15 and 16. Article IV describes how the legislature per-

forms its functions. We deal with Wis. Const. art. I, sec. 3. Before applying the *Beno* analysis to art. I, sec. 3, it is necessary to explain why the presumption should exist that a specific provision in art. 1 is intended to protect persons only from state action.

The constitutional context of the free speech provision is the Declaration of Rights. Section 3 has been part of this state's Declaration of Rights since 1848. In that year the people ratified not only the constitution but those sections separately set off from all others as a Declaration of Rights. That heading was adopted as part of the constitution. Accordingly, the heading of art. 1, Declaration of Rights, is not something which may be ignored as may, for example, a statute's title.[2] The heading is as much a part of the constitution as sec. 3 itself.

A proper understanding of the free speech provisions in Wis. Const. art. I, sec. 3, therefore requires an examination of the function of a declaration or bill of rights in a state constitution. A declaration or bill of rights is, at its very least, a solemn statement of those powers, privileges and liberties considered basic and most important. *Compare Black's Law Dictionary* 149 (rev. 5th ed. 1979) (a "bill of rights" is a "formal and emphatic legislative assertion and declaration of popular rights and liberties usually promulgated upon a change of government; . . . the summary of the rights and liberties of the people, or of the principles of constitutional law deemed essential and fundamental, contained in many of the American state constitutions").

[2] Because a title of a statute is not part of the statute, it cannot be considered when determining whether a statute is ambiguous. *Hemerley v. American Fam. Mut. Ins. Co.,* 127 Wis. 2d 304, 307, 379 N.W.2d 860, 862 (Ct.App. 1985); sec. 990.001(6), Stats.

A declaration or bill of rights is, however, more than a mere statement of rights. It is a statement of rights reserved and withheld from governmental action. It is a limitation and restraint on governmental action. It is a negative protection against state action. Thus, the modern dictionary definition of a bill of rights is "a summary of certain fundamental rights and privileges guaranteed to a people against violation by the state. . . ." *Webster's Third New International Dictionary* 216 (1976). This concept of a declaration or bill of rights has been accepted by historians, learned writers and legal commentators. It has also been accepted by the Wisconsin Supreme Court.

We look to the views of historians because history helps us understand the constitution. *State ex rel. Weiss v. District Board,* 76 Wis. 177, 203, 44 N.W. 967, 976 (1890) (Cassoday, J., concurring). We are to "put ourselves in the place the constitution makers occupied,—look at the situation they had in view through the same vista they observed it. . . ." *State ex rel. Owen v. Donald,* 160 Wis. 21, 81, 151 N.W. 331, 350 (1915). We must try to think like mid-nineteenth century constitution makers probably thought, for sec. 3 of the Declaration of Rights has never been amended since its adoption in 1848.

By stating the people's retained rights, a declaration or bill of rights in the early constitutions satisfied the second part of a theory of government. That twofold theory distinguishes rights entrusted by the people to the state for safeguarding from retained rights withheld from state interference. The theory is described by C. H. McIlwain in 2 *Encyclopaedia of the Social Sciences* 545–46 (1930):

128

The basic theory underlying the early bills of rights is a belief in the rights of individual men and in rights existing in the law of nature independent of states or their laws, as set forth especially in Locke's *Second Treatise of Government* (1690). Some of these rights were regarded as alienable and might be entrusted by a people to its government for due compensation, but there are others of which no man is ever capable of divesting himself or his posterity even by consent or for compensation; they are inalienable. An instrument of government ought then to consist of two parts: a "frame" or form of government in which the first of these two kinds of rights, the alienable ones, are entrusted to the various organs of the state under proper safeguards for due compensation in the form of just and effective government; and a "bill of rights" enumerating the inalienable rights of the people which they cannot delegate to their government and which the latter is explicitly forbidden ever to infringe.

At the time of the American Revolution, a consensus existed that "[n]o written constitution can be considered complete unless it embodies a specific declaration of rights." C. Rossiter, *Political Thought of the American Revolution* 185 (1953). "The bill of rights was to be something more than a symbol or incantation. The plan and powers of government had to conform to the people's own statement of the rights they were retaining." *Id.* at 186.

That the same point applied to state constitutions was recognized soon after the United States Constitution was adopted on September 18, 1787. Only four months later, January 17, 1788, "Brutus" said, "[a]ll the state constitutions, contain either formal bills of rights, which set bounds to the powers of the legisla-

129

ture, or have restrictions for the same purpose in the body of the constitutions." Essays of Brutus, in *The Antifederalist* 153–54 (H. Storing ed. 1985).

A legal historian, Professor James Willard Hurst, refers to "the liberty guaranteed by the negatives, which the Bill of Rights sets on official power." J. Hurst, *Law and the Conditions of Freedom* 37 (1956). He describes the state constitutions as having "dealt largely with the limitation of powers that resided in state governments without the need of affirmative grant." J. Hurst, *The Growth of American Law* 241 (1950).

Other historians agree. In the first state constitutions the "[p]rincipal restraints placed on lawmaking bodies were the bills of rights designed to protect persons and property from arbitrary government action." A. Sturm, *The Development of American State Constitutions,* in *Publius* 61 (Winter 1982). Few changes in state bills of rights occurred between 1800 and 1860. *Id.* at 63. Professor W. Y. Elliott refers to bills of rights in state constitutions as *"admonitions to the legislature which aimed at preventing the abuse of private rights."* Elliott, *The Constitution as the American Social Myth,* in *The Constitution Reconsidered* 217 (C. Read ed. 1938) (emphasis in original). The same thought is expressed in C. Friedrich & R. McCloskey, *The Roots of American Constitutionalism,* in *From the Declaration of Independence to the Constitution* xix (1954): the key idea of a bill of rights is "that of the sacred sphere of human right which no government invades but at its peril."

In his historical discussion of liberty, Professor Roscoe Pound said that the "liberty guaranteed by our bills of rights is a reservation to the individual of certain fundamental reasonable expectations. . . ."

Pounds, *The Development of Constitutional Guarantees of Liberty,* Part 1, 20 Notre Dame Law. 183, 183 (1945). "[B]ills of rights are bills of liberties. They define circumstances and situations and occasions in which politically organized society will keep its hands off and permit free spontaneous individual activity; . . . ." Pound, *The Development of Constitutional Guarantees of Liberty,* Part III, 20 Notre Dame Law. 347, 379 (1945).

Justice Story, who served on the United States Supreme Court from 1811 to 1845, recognized the nature of a bill of rights. He wrote,

> [A] bill of rights is important, and may often be indispensable, whenever it operates, as a qualification upon powers, actually granted by the people to the government. This is the real ground of all the bills of rights in the parent country, in the colonial constitutions and laws, and in the state constitutions.

3 J. Story, *Commentaries on the Constitution of the United States* sec. 1858, at 718 (Boston 1833).[3]

---

[3] Joseph Story's *Commentaries on the Constitution of the United States, supra,* enjoyed great stature.

> Taking them in the order of publication, Story's books upon the Constitution, upon conflict of laws and upon equity have had special influence. If Marshall made our public law, . . . Story authoritatively expounded it. The influence of his book is to be traced through Cooley into nearly all the texts of the last part of the nineteenth century. . . .

Pound, *The Place of Judge Story in the Making of American Law,* 48 Am. L. Rev. 676, 694 (1914). James Kent, author of *Commentaries on American Law* (New York 1826), described Story's *Commentaries* as a "most profound, learned, acute, and excellent production, distinguished for its accuracy, fulness, and judgment."

Other nineteenth century law commentators agreed with Story that state declarations or bills of rights are limitations on state action. A declaration of rights in a state constitution "is inserted in the constitution for the express purpose of operating as a restriction upon legislative power." T. Cooley, *A Treatise on the Constitutional Limitations* 176 (Boston 1868). "The separate states have also adopted constitutions which contain . . . limitations upon the local governments. It is a fact, therefore, that the entire legislative and administrative power of the whole country, whether wielded by the nation or by the states, is subject to restraints. . . ." J. Pomeroy, *An Introduction to the Constitutional Law of the United States* sec. 230, at 145 (New York 1868). Bills of rights in state constitutions establish a line beyond which "no human legislation should be suffered to conflict with the rights declared to be *inherent and inalienable.*" W. Bateman, *Political and Constitutional Law* sec. 16, at 14 n.1 (St. Louis 1876) (emphasis in original)[4] .

The Wisconsin Supreme Court has recognized that our Declaration of Rights creates limitations or restrictions on state action. Section 1 of the Declaration of

Chief Justice John Marshall wished that Story's work "could be read by every statesman, and every would-be statesman in the United States." *See* Letters from James Kent and Chief Justice Marshall to Joseph Story, in 2 *Life and Letters of Joseph Story* 134–35 (W. Story ed. 1851).

[4] That the Cooley, Pomeroy and Bateman texts were written in 1868 and 1876 does not detract from their usefulness when determining the understanding in 1848 of a declaration of rights. *See Beno,* 116 Wis. 2d at 139–40, 341 N.W.2d at 677 (1878 dictionary used when interpreting Wis. Const. art. IV, sec. 15).

Rights contains no reference to laws or express limitation on state action.[5] In *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 532, 90 N.W. 1098, 1099 (1902), the supreme court said, "[a]t this late date it cannot be doubted that this declaration of the purpose to be accomplished is to be construed as a limitation upon the powers given." *See also Pauly v. Keebler,* 175 Wis. 428, 430–31, 185 N.W. 554, 556 (1921) ( art. 1, sec. 1, is a "limitation of legislative power"); *State v. Redmon,* 134 Wis. 89, 101, 114 N.W. 137, 138 (1907) ( art. 1, sec. 1, contains a "broad general restriction of legislative power"); *Nunnemacher v. State,* 129 Wis. 190, 230, 108 N.W. 627, 640 (1906) (Dodge, J., dissenting) ( art. 1, sec. 1, is a "limitation upon the powers delegated to the government"); *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 434–35, 87 N.W. 561, 562 (1901) ( art. 1, sec. 1, imposes a "limitation" on the legislature).

Section 9 of the Declaration of Rights contains no reference to laws or express limitation on state action.[6] *Durkee v. City of Janesville,* 28 Wis. 464, 469–71 (1871), nevertheless held that sec. 9 is a limitation upon the power of the state to discriminate between the rights of different parties to the same litigation. *See also City*

---

[5] Section 1 of the Declaration of Rights, art. I, sec. 1, provides, "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

[6] Section 9 of the Declaration of Rights, art. I, sec. 9, provides:

Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

*of Janesville v. Carpenter,* 77 Wis. 288, 301, 46 N.W. 128, 132 (1890) (statute taking property without compensation or due process and denying person equal protection violated art. 1, secs. 9 and 13); *Hincks v. City of Milwaukee,* 46 Wis. 559, 566, 1 N.W. 230, 232 (1879) ( art. 1, sec. 9 invalidates legislative immunity granted to one municipality but not to others).

Section 22 of the Declaration of Rights contains no reference to law and no express limitation on state action.[7] *State ex rel. Milwaukee Medical College v. Chittenden,* 127 Wis. 468, 521, 107 N.W. 500, 517–18 (1906), nevertheless refers to "the implied inhibition" in that section.

By 1910 the supreme court could state generally that the Declaration of Rights "constitute[s] inhibitions of legislative interference by implication, and with quite as much efficiency as would express limitations, as this court has often held." *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 15, 128 N.W. 1041, 1946 (1910).

Given these repeated references to the Declaration of Rights as a limitation on state action, we should find some support in the decisions of the Wisconsin Supreme Court for the proposition that our Declaration does not protect private persons from private interference. Although the Wisconsin Supreme Court has seldom had to recognize the principle, a few decisions support it.

---

[7] Section 22 of the Declaration of Rights, art. I, sec. 22, provides: "The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."

Section 18 of the Declaration of Rights guarantees freedom of religion to every person in this state.[8] Section 18 does not refer to state action except that preference may not be given to any religious establishment or mode of worship and state funds may not be used to benefit religious organizations. When, however, a mother bequeathed annual payments to her son on condition that he attend a named church, the supreme court rejected his argument that the condition was repugnant to sec. 18. *In re Paulson's Will,* 127 Wis. 612, 618, 107 N.W. 484, 486–87 (1906).

In *Barry v. Order of Catholic Knights,* 119 Wis. 362, 96 N.W. 797 (1903), a widow sued on a death benefit certificate issued by a Roman Catholic association from which her husband had been expelled, his marriage to her having caused his excommunication. She contended that provisions in the association's constitution and bylaws that require members to be "practical Catholics" violated sec. 18 of the Declaration of Rights. The *Barry* court rejected the argument. *Id.* at 366, 96 N.W. at 799.

In *State ex rel. Dame v. LeFevre,* 251 Wis. 146, 28 N.W.2d 349 (1947), an expelled union member sought reinstatement. The *LeFevre* court rejected his claim

---

[8] Section 18 of the Declaration of Rights, art. I, sec. 18, provides:

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

that he could not be expelled without due process of law. The court said, "The due process clauses of the state and federal constitutions are not applicable to contract relationships between individuals." *Id.* at 152, 28 N.W.2d at 353.

Section 11 of the Declaration of Rights protects persons against unreasonable searches and seizures, but does not expressly limit the right against unreasonable searches and seizures to those conducted by the state.[9] *Ware v. State,* 201 Wis. 425, 230 N.W. 80 (1930), held that defendant's diary was admissible in evidence against her. Defendant's former husband had taken a key from her purse, unlocked the chest in which the diary was kept and apparently delivered it to the prosecution. The *Ware* court held that procurement of the diary did not violate some constitutional right of the defendant. *Id.* at 427, 230 N.W. at 80–81. *See also Potman v. State,* 259 Wis. 234, 239–40, 47 N.W.2d 884, 886–87 (1951) (search by private persons without defendant's consent does not violate sec. 11 ).

That the Wisconsin Declaration of Rights was intended when written to restrict state action therefore cannot be doubted. Mid-nineteenth century lawyers had to understand that the function of a declaration or bill of rights is to restrain state interference with individual liberties. Nineteen lawyers were members

---

[9] Section 11 of the Declaration of Rights, art. I, sec. 11, provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

of the sixty-nine member state constitutional convention when it convened December 15, 1847. Brown, *The Making of the Wisconsin Constitution*, 1952 Wis. L. Rev. 23, 24.

Hence, the suggestion that a specific provision in the Declaration grants rights to persons enforceable against other private persons proposes a new direction. The proposal would work a change from withholding rights from government action to granting rights in every person enforceable against all other persons. To hold that a negative restraint on government creates a positive right assertable against all other persons would be a sharp and unexpected deviation from the apparent original course.

Because the proposed change deviates from the original direction of the Declaration of Rights, we should presume that a specific provision in the Declaration is intended to protect persons only from state action unless strong evidence exists to the contrary. When constitution makers can be found, as here, to have had an intention consistent with a prevailing concept of government, but we are urged to find that they intended an additional theory, it is fair to force proponents of the new theory to prove that it also was intended.

The presumption that protection only from state action was intended accommodates those provisions in the Declaration of Rights which may protect persons from certain actions by private persons. Section 2 prohibits slavery or involuntary servitude except to punish for crime. Section 14 prohibits leases and grants of agricultural land for more than 15 years and voids restraints upon alienation. Section 16 prohibits imprisonment for debt. Section 17, requiring laws creating ex-

emptions from seizure or sale for payment of debt, may be another example.

The presumption should apply at every level when interpreting the Declaration of Rights, since the aim of constitutional analysis is to find the meaning intended by the framers. *State ex rel. Zimmerman,* 201 Wis. at 88–89, 228 N.W. at 595. This is true whether the analysis stops at the plain meaning stage or reaches the other methods of constitutional interpretation outlined in *Beno.*

Having outlined the presumption necessary when interpreting a section of the Declaration of Rights, I turn to the first stage of constitutional analysis mandated by the *Beno* court. 116 Wis. 2d at 136–37, 341 N.W.2d at 675.

Whether a constitutional provision has a plain meaning turns on the answer to a single question: can reasonable persons understand the provision differently? *State v. Beno,* 110 Wis. 2d 40, 48, 327 N.W.2d 712, 716 (Ct.App. 1982), *rev'd on other grounds,* 116 Wis. 2d 122, 341 N.W.2d 668 (1984).

Each of the two clauses in the first sentence of Wis. Const. art. 1, sec. 3, is grammatically complete. Standing alone, the first clause has a plain meaning. If "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right . . . ," the presumption provides the one reasonable meaning of these words: they protect only against state action. Standing alone, the second clause is also plain, given the presumption. If "no laws shall be passed to restrain or abridge the liberty of speech or of the press," this clause protects persons only from state action. The express prohibition in the second clause against laws abridging free speech suggests,

however, that unless the first clause protects free speech from private as well as state action, the first clause is redundant. When read together in a single sentence, the possible redundancy could deprive the two clauses of a plain meaning.

The redundancy issue was raised in *Cologne v. Westfarms Associates,* 469 A.2d 1201 (Conn. 1984). An advocacy group had demanded access to a privately-owned shopping mall for free speech purposes. Section 4 of the Connecticut Declaration of Rights provides, "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Section 5 of the Connecticut Declaration provides, "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." The advocacy group argued that to restrict the protection of free speech afforded by sec. 4 solely to instances of state interference would make that provision merely redundant of sec. 5. The *Cologne* court disposed of the redundancy argument in two ways.

First, the *Cologne* court said that sec. 5 "literally applies only to the passage of laws restraining freedom of speech or press and does not by its terms afford protection provided by sec. 4 against restrictions upon the exercise of those rights which government officials may impose whether or not sanctioned by law." 469 A.2d at 1209. The same approach would at least partially dispose of the redundancy issue regarding Wis. Const. art. 1, sec. 3.

Second, the *Cologne* court reviewed the debate at the Connecticut constitutional convention of 1818. The court read certain remarks at the convention to indicate that sec. 4 is a limitation on sec. 5. The limitation would authorize the passage of laws or the application

of the common law with respect to defamation or sedition, but preclude any prior restraint. *Id.* at 1209 n.9. Thus, the Connecticut supreme court appears to have concluded that the redundancy problem was either minimal or did not exist.

I conclude that whether it is minimal or not, the redundancy issue regarding the first and second clauses in the first sentence of Wis. Const. art. 1, sec. 3, should be treated as depriving that sentence of a plain meaning.

Because the first sentence of Wis. Const. art. 1, sec. 3, lacks a plain meaning, I reach the second analytical stage mandated by the supreme court in *Beno:* an examination of the constitutional debate in 1848. The record of that debate pertinent to sec. 3 of the Declaration of Rights is scant and unhelpful.

The 1848 convention convened December 15, 1847. *Journal of the Convention to Form a Constitution for the State of Wisconsin* 3 (Madison 1848). One week later the committee on general provisions reported on an unnumbered article entitled "Declaration of Rights," sec. 3 of which became the present sec. 3 of the Declaration. *Id.* at 50. During the entire convention a single amendment to strike certain words in the second sentence was proposed to sec. 3. The motion failed. *Id.* at 92. The record of the 1848 debate therefore fails to illuminate the free speech provision in Wis. Const. art. 1, sec. 3, so far as is pertinent to the issue before us.

Since the debates in the 1848 constitutional convention do not help us, we turn to those in the 1846 constitutional convention. We look to the earlier convention if, as here, the present constitution and the rejected 1846 constitution contain a similar provision. *State ex rel. Zilisch v. Auer,* 197 Wis. 284, 289–90, 221

N.W. 860, 862 (1928). The first sentence of sec. 3 in the Bill of Rights, art. XVI, of the rejected constitution of 1846 is identical to that in sec. 3 of the Declaration of Rights in the 1848 constitution.

The 1846 convention convened October 5, 1846. *Journal of the Convention to Form a Constitution for the State of Wisconsin* 3 (Madison 1847). October 28, 1846, the committee on a bill of rights recommended adoption of a bill, sec. 5 of which provided: "The legislature shall make no law abridging the freedom of speech, or the right of the people peaceably to assemble, and to petition for a redress of grievances." *Id.* at p. 123. November 4, 1846 the convention resolved itself into a committee of the whole for the consideration of the proposed bill of rights, "[a]nd after some time spent therein, the committee rose, and reported progress, and asked leave to sit again." *Id.* at 194–95. The committee continued to consider the bill of rights the next morning and afternoon. *Id.* at 197–98. Few other references to the bill of rights appear in the *1846 Journal. Id.* at 294–301.

Milo M. Quaife, of The State Historical Society of Wisconsin, fleshed out both the 1846 and 1848 Journals. He did so because, "the constitutional fathers of Wisconsin were chary of devoting state funds to the printing of a record of their proceedings. The first convention preserved no record of its debates, while the official journal comprises a modest volume of 500 pages." *The Convention of 1846,* at 5 (M. Quaife ed. 1919). Quaife made a "painstaking effort . . . to reconstruct the debates and to assemble the other pertinent records pertaining to the birth of our commonwealth. . . ." *Id.* at 6. He reconstructed the debates "for the

most part from the newspaper reports of the day (in large part from the Madison newspapers). . . ." *Id.*

Quaife's research partially fills out the November 4, 1846 debate on sec. 5. Quaife reports that on that day:

> The fifth section, which reads in the original: "The legislature shall make no law abridging the freedom of speech or the right of the people peaceably to assemble and to petition for a redress of grievances," was very generally objected to as too indefinite. Several substitutes were proposed, and one, offered by Mr. Lovell, after being amended by Marshall M. Strong, was adopted.

*Id.* at 365. Quaife does not set forth Lovell's substitute. Our search of the records of the State Historical Society failed to reveal it.[10] It is fair to infer, however, from the absence of other references in the *1846 Journal* or by Quaife to sec. 5 of the proposed bill of rights, that Lovell's substitute became art. XVI, sec. 3, of the Bill of Rights in the rejected 1846 constitution, the first sentence of which is repeated in Wis. Const. art. 1, sec. 3.

Lovell's substitute for the original sec. 5 of the proposed bill of rights made the free speech provision more definite by expanding it. The substitute expanded the original proposal by including an affirmative statement that every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, prohibiting a restraint as well as abridgement, and embracing liberty of the press as well as liberty of speech.

---

[10] Quaife's source must have been the first page of *The Madison Express* issue for November 10, 1846. That issue does not set forth the amendment.

The expansion of sec. 5 does not indicate an intent to change the concept that a declaration of rights restrains the government from interfering with rights retained by the people. The change from the original free speech proposal in 1846 to the free speech guaranty in sec. 3 of the 1848 Declaration is therefore consistent with the presumption that a provision in the Declaration of Rights is intended as only a restraint on state action.

Since nothing in the 1846 or 1848 constitutional debates is inconsistent with the presumption that Wis. Const. art. I, sec. 3, is only a restraint on state action, I turn to the last analytical stage of constitutional interpretation outlined in *Beno:* the objectives of the framers.[11] The sole objective of the framers inferable from the concept of government displayed by a mid-nineteenth century declaration of rights is protection of persons from state action. Nothing to contradict that inference has been called to our attention.

Because no showing has been made to justify the proposition that the free speech provisions in sec. 1 of the Declaration of Rights protects persons from private as well as state interference, the defendants have no right to remain on the malls contrary to the wishes of the owners. Because they persist in their trespass, they were properly enjoined by the trial court.

Having come to my conclusions after following the analysis required by the Wisconsin Supreme Court for interpretation of our state constitution, I need not examine the decisions of other state appellate courts regarding the free speech provisions in their constitutions. My conclusion is, however, consistent with those

---

[11] I find no early legislative interpretation of Wis. Const. art. I, sec. 3. That stage of analysis under *Beno* is inapplicable.

of the highest state courts which have analyzed their constitutions in terms of the intention of the framers.[12]

---

[12] *See Cologne,* 469 A.2d at 1207–08 (Conn. 1984) (no evidence of intent in Connecticut Declaration to create privilege to exercise free speech right on private property of others); *Woodland v. Michigan Citizens Lobby,* 378 N.W.2d 337, 344–48 (Mich. 1985) (intent in free speech provision in Michigan Declaration that constitutional protection limited to rights of individuals against government conduct); *Shad Alliance v. Smith Haven Mall,* 488 N.E.2d 1211, 1215 (N.Y. 1985) (drafters intended New York Constitution to protect individual rights from governmental infringement and not to protect rights of private individuals against private individuals). *Contra Robins v. PruneYard Shopping Center* 592 P.2d 341, 346 (Cal. 1979), *aff'd,* 447 U.S. 74 (1980) (California free speech provision protects persons from private infringement, since framers could have adopted words of federal bill of rights but chose not to do so); *State v. Schmid,* 423 A.2d 615, 627–28 (N.J. 1980), *appeal dismissed sub nom.,* 455 U.S. 100 (1982) (protection of free speech right on private property comports with presumed intent of framers of constitution, at least on privately-owned campus substantially devoted to public use); *Alderwood Assoc. v. Wash. Envir. Council,* 635 P.2d 108, 115 (Wash. 1981) (because Washington free speech provision contains no express mention of "state action," court chose to follow approach of *Robins* and *Schmid*). The *Alderwood Assoc.* author later concluded historical evidence also indicates that the Washington free speech provision protects against private abridgement of free speech rights. Utter, *The Right to Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment,* 8 U. Puget Sound L. Rev. 157, 172–77 (1985).