AUGUSTINE, Appellant, v. ANTI-DEFAMATION LEAGUE OF B'NAI B'RITH, and another, Respondents.

*No. 75–223. Argued November 3, 1976.—*
*Decided January 18, 1977.*
(Also reported in 249 N. W. 2d 547.)

For the appellant there were briefs by *David L. Walther, John Sundquist* and *Walther & Halling,* and oral argument by *David L. Walther,* all of Milwaukee.

For the respondent Anti-Defamation League of B'nai B'rith there was a brief by *Robert H. Friebert, Thomas W. St. John* and *Friebert & Finerty,* and oral argument by *Robert H. Friebert,* all of Milwaukee.

HEFFERNAN, J.   The plaintiff, Allan E. Augustine, prior to being discharged on June 4, 1974, was an employee of Radio Station WOKY in Milwaukee, owned by Bartell-Media Corporation. The discharge arose out of his handling of a talk show in which members of a group calling themselves the National Socialist White People's Party, hereinafter guests, used various epithets in respect to Jews and blacks. Jews were described as being dealers in smut, pornography, and crime, of being parasites, of being devious and characterized as abscesses, maggots, and beasts. Blacks were accused of being lazy and primitive. Augustine failed to push the "panic button," which would have deleted the objectionable material from the broadcast. He also failed to activate the disclaimer tape which was available for use at the end of the broadcast to state that the views expressed were those of the talk show guests and not of the station management.

Subsequently, numerous complaints were received by the station objecting to the way the program was handled and to the content of the talk show. A number of individuals called the station manager the next day to voice their objections. One of the callers was Saul Sorrin, Regional Director of the Anti-Defamation League of B'nai B'rith. Following the calls from Sorrin and from Professor Burke of the English Department of the University of Wisconsin in Milwaukee, Ralph Barnes, the general manager of Radio Station WOKY, listened to the tapes of the program of the preceding evening and con-

cluded that Augustine handled the program in a manner inconsistent with the professional code of the National Association of Broadcasters. He directed that Augustine be fired. Augustine's employment was terminated the next day.

In the adverse examination of Barnes, which was stipulated to be a part of the record on the motion for summary judgment, Barnes made the statement:

"I made that decision that the show was—indeed the way Mr. Augustine handled the show was in violation to commitment to the Code. Then I made the decision to dismiss him."

As a consequence of the discharge, Augustine commenced an action for damages against the ADL and Ralph Barnes.

As his first cause of action, he alleged that his discharge was caused as a result of the complaint brought by the ADL and that such discharge was in violation of sec. 111.325, Stats., a portion of the State of Wisconsin's Fair Employment Act.

As a second cause of action, he also alleged that the complaint made by the ADL in respect to the program interfered with his employment contract with his employer, the Bartell-Media Corporation, the corporation which owned Radio Station WOKY.

A third cause of action was alleged for conspiracy— that the defendants, Barnes and the ADL, combined by concerted action for the purpose of injuring the plaintiff in his profession and that such concerted action resulted in the breach of Augustine's employment contract with Bartell-Media.

Each of these causes of action as to the ADL was dismissed by the trial court—the first, following a demurrer to the complaint, and, the second and third, following an order granting the defendant ADL's motion for summary judgment. The order sustaining the defendant

ADL's demurrer to the first cause of action was entered on November 18, 1974, and the judgment on the entire action was entered on May 5, 1975. A notice of appeal in respect to the judgment was filed in the circuit court on July 9, 1975. That notice appealed from the whole of the judgment entered in May and also sought "review from that portion of the Order made and entered under date of November 18, 1974, which sustained the demurrer to plaintiff's first cause of action."

This appeal concerns only Augustine's action against the Anti-Defamation League. Barnes answered Augustine's complaint, and that portion of the case is pending in the circuit court.

The initial question presented is whether the order which sustained the demurrer to the first cause of action and which was not separately appealed from within the time provided by the statutes for an appeal from an appealable order can be reviewed as an intermediate order upon appeal from the final judgment. We conclude that the order sustaining the demurrer may be reviewed on the appeal from the judgment.

While the defendant ADL, which objects to the jurisdiction of this court to now hear the review of the order on demurrer, correctly points out that, under sec. 274.33 (3), Stats., the order on demurrer constituted an appealable order and could have been brought separately, it overlooks the effect of sec. 274.34. Sec. 274.34 provides:

"274.34 Appeals, Intermediate orders may be reviewed. Upon an appeal from a judgment, and upon a writ of error, the supreme court may review any intermediate order which involves the merits and necessarily affects the judgment, appearing upon the record."

That situation was considered by this court in *State ex rel. Star Prairie v. St. Croix County*, 83 Wis. 340, 53 N.W. 698 (1892). The court held that, although a separate appeal could have been taken on the order on the

demurrer, such order could be reviewed upon an appeal from a final judgment after the time for separate appeal on the demurrer had run. The court said:

"It is objected by respondent that this court cannot consider the correctness of the rulings of the circuit court upon the demurrer, because no appeal was taken directly from the order thereon, and that the time for an appeal therefrom has expired. The objection is not tenable, because upon appeal from final judgment the question as to the correctness of the order upon the demurrer may be reviewed." (at 344)

■ Accordingly, the order which sustained ADL's demurrer to the first cause of action, together with the final judgment which dismissed as to ADL the second and third causes of action following the order for summary judgment, is before us on this appeal.[1]

In the first cause of action, the plaintiff alleged that he was discriminated against in violation of the Wisconsin Fair Employment Act, sec. 111.31 ff., and also was denied his right of free speech under the Constitutions of the United States and of the State of Wisconsin. We dispose of the latter contention first.

■ We see nothing in the alleged complaint that states a cause of action against the defendant ADL for abridging

---

[1] We are not unmindful of the defendant's position that the cause of action involved in the demurrer was based on a different theory than those causes of action that were disposed of on summary judgment. Nevertheless, all three alleged causes of action related to a single cause of action, since each, although based on a different theory, involved the same operative facts. *Caygill v. Ipsen*, 27 Wis.2d 578, 135 N.W.2d 284 (1965). Moreover, in the instant case, no order of dismissal was entered in respect to the first cause of action following the order on the demurrer. It was not until the entry of the final judgment that a dismissal on that allegation was effective. Also, by failing to object earlier in respect to the timeliness of the appeal from the order sustaining the demurrer, the defendant waived any objection to personal jurisdiction. *State v. Van Duyse*, 66 Wis.2d 286, 224 N.W.2d 603 (1975).

Augustine's freedom of speech. Construing the complaint most liberally to state a cause of action, if at all possible, the most that can be gleaned in that respect is that Augustine claims to have been deprived of his "right" to be employed and paid by the Bartell-Media Corporation for the exercise of his (Augustine's) First Amendment rights. No authority has been cited by the plaintiff that tends to establish that a person's right of free speech is infringed by the termination of his employment as a radio announcer on a talk show or that the termination is actionable on First Amendment grounds.

Nor do we find that any cause of action was stated under the Fair Employment Act. The Fair Employment Act, sec. 111.325, Stats., provides:

"111.325 Unlawful to discriminate. It is unlawful for any employer, labor organization, licensing agency or person to discriminate against any employe or any applicant for employment or licensing."

Sec. 111.32(5) (a), Stats., provides:

"(5) (a) 'Discrimination' means discrimination because of age, race, color, handicap, sex, creed, national origin or ancestry, by an employer or licensing agency individually or in concert with others, against any employe or any applicant for employment or licensing, in regard to his hire, tenure or term, condition or privilege of employment or licensing and by any labor organization against any member or applicant for membership, and also includes discrimination on any of said grounds in the fields of housing, recreation, education, health and social welfare as related to a condition or privilege of employment."

The trial judge concluded that the Fair Employment Act, although to be liberally construed, concerned the relationship between employers and employees. Since the Anti-Defamation League was not the plaintiff's employer, he held the statute inapplicable. We do not find it necessary to resolve that question in affirming the

order on the demurrer, for the trial judge also found that the conduct of ADL was not embraced within the statutory definition of the word, "discrimination"—that no conduct of the ADL was related to the "age, race, color, handicap, sex, creed, national origin or ancestry" of either the guests on the program or of Augustine.

On this appeal it is argued, however, that the statute indeed applies because "discrimination," as defined in sec. 111.32 (5) (a), Stats., includes discrimination because of "creed." It is asserted in the plaintiff's brief, although it is not alleged in the complaint, that the guests, who were members of the National Socialist White People's Party, were organized "to propagate a system of belief or opinion." Augustine argues that a system of belief or opinion constitutes a "creed" and is therefore embraced in the Fair Employment Act.

Webster's *Third New International Dictionary* defines "creed" as:

"3a: a formulation or system of religious faith . . . b: a religion or religious sect . . . c: a formulation or epitome of principles, rules, opinions, and precepts formally expressed and seriously adhered to and maintained: a notion or complex of notions viewed as so expressed or adhered to . . . ."

The dictionary indeed does under "c" define "creed" in the manner urged by the plaintiff. The question then is whether the term, "creed," as used in the statute, refers only to a system of religion or religious faith and not to a political philosophy. Those courts which have considered the question have concluded that "creed" refers only to matters of religion or religious faith. In *Shuchter v. Division of Civil Rights*, 117 N.J. Super. 405, 285 A.2d 42 (1971), an anti-Vietnam war organization which had been denied the rental of a building brought action under the New Jersey statute which prohibited discrimination on the basis of "creed." The court there found nothing in the legislative history or of the New

Jersey constitution which indicated that "creed" had any meaning other than that in reference to a religious belief. It concluded that the common understanding of the meaning of the term, "creed," was intended by the legislature. The court said:

"We do not believe, however, that it is our function as a reviewing court to expand a legislative enactment because of new trends in the definition of a word. Whether discrimination on the basis of moral, philosophical, social or political values should be condemned or permitted among the citizens of this state is a question most properly answerable by the legislature." (at 408) *See* also, *Cummings v. Weinfeld*, 177 Misc. 129, 30 N.Y.S.2d 36.

█ The definition section of the Fair Employment Act leads inevitably to the same conclusion. Discrimination, by the definition, embraces "age, race, color, handicap, sex, creed, national origin or ancestry." There is no specific mention of discrimination on the basis of religion. Yet, it would be unthinkable to conclude that any anti-discrimination legislation would not prohibit discrimination on religious grounds. "Creed" in its commonly accepted sense and in the preferred dictionary definition does, however, refer to religion. It seems abundantly clear, therefore, that the term, "creed," as used in the Wisconsin statute means not a system of political philosophy or beliefs but a system of religious beliefs. There is no contention that the philosophy of the guests on the program was of a religious nature. Discrimination in the sense urged by the plaintiff is not prohibited by the statutes.

█ It should also be added that the factual allegations are insufficient to spell out any form of discrimination by the ADL, whether viewed in the light of the statute or otherwise. The demurrer was properly sustained.

The second and third causes of action were dismissed following defendant's motion for summary judgment. The second cause of action alleged a tortious interference

with the contract—that ADL induced the breach of Augustine's employment contract; and the third cause of action alleged that the defendants, ADL and Barnes, "did combine by concerted action" for the purpose of causing the breach of Augustine's employment with the Bartell-Media Corporation.

In respect to the third cause of action, the trial judge, after examination of the affidavits, concluded:

"There is a total deficiency of any evidence that ADL conspired with anyone to terminate plaintiff's employment contract. Barnes' testimony clearly stated that Sorrin didn't even mention plaintiff in his criticism of the show other than to indicate it got out of hand. This is insufficient to permit plaintiff to go to trial on this cause of action."

■ ■ We agree with that conclusion, for none of the factual elements for the proof of a conspiracy appear in the affidavits on summary judgment. At a minimum, to show a conspiracy there must be facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end. See *Boyce v. Independent Cleaners, Inc.*, 206 Wis. 521, 240 N.W. 132 (1932); *Cranston v. Bluhm,* 33 Wis.2d 192, 147 N.W.2d 337 (1967). The facts in respect to a conspiracy were insufficient for submission to the jury.

In the second cause of action, Augustine alleges that the Anti-Defamation League, by its protests and complaints in respect to the plaintiff's program, induced and caused the Bartell-Media Corporation not to perform its employment contract with Augustine.

In support of the motion for summary judgment the defendant ADL offered an affidavit of Saul Sorrin in which he stated that he never requested nor discussed the plaintiff's dismissal with Barnes, that he did not conspire with Barnes in respect to such dismissal, and that he was

following the policy of the ADL to comment not on personalities but on the subject matter of the program.

In its counter-affidavit, the plaintiff offered an excerpt from an adverse examination of Barnes in which he stated that he did not listen to Augustine's show on the night of June 2, 1974, that when he got to the office on June 3, a member of his staff reported on the controversy in respect to the program, that Professor Burke, a member of the English faculty at the University of Wisconsin, called to complain, that Sorrin complained subsequently, and that Sorrin was critical of the way the show was handled but not of Augustine personally.

Barnes also stated that he then listened to the tape recordings of the show for the purpose of determining whether the complaints he had heard about the show were correct. He stated further that he received approximately 20–30 additional calls complaining about the show, and that, later on the same morning, he concluded that the conduct of the show was not in accordance with the code of the National Association of Broadcasters, conformance to which was required of all station personnel. He then directed that Augustine be fired.

On the basis of these facts, the trial judge concluded that, under the general principles of sec. 766, Restatement of *Torts* (1939), adopted by this court in *Mendelson v. Blatz Brewing Co.*, 9 Wis.2d 487, 101 N.W.2d 805 (1960), there were facts sufficient to show that Sorrin exerted moral pressure on Barnes with the phone call. He concluded that that fact, if believed by the jury, would under Restatement 2d, *Torts*, Tentative Draft No. 14 (1969), sec. 766, constitute interference with the contract. He relied on comment *j* and comment *k* of the Tentative Draft:

" '(The rules) apply, in other words, to interferences which are incidental to the actor's independent purpose and desire, but are known to him to be necessary conse-

quences of his acts.' Restatement 2nd Torts (Tentative Draft No. 14, 1969) Sec. 766, Comment (j).

"Comment (k) states 'Means of interference. There is no technical requirement as to the kind of conduct that may result in interference with the contract. It may be any conduct which conveys to the third person the actor's desire to influence him not to deal with the other. Thus, it may be a simple request or persuasion which exerts only moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other.' "

The trial judge concluded, however, that the call made by Sorrin was made in the exercise of a privilege to assert complaints. He granted the summary judgment despite the possible proof of interference with the contract, because, as he stated:

"The right of free speech as guaranteed by the Constitution is a privilege which has been asserted and correctly so by ADL."

We agree with the trial judge's conclusion in granting summary judgment, and we also agree that, had the conduct of ADL indeed constituted interference with Augustine's employment contract, the privilege existed and it was properly asserted by the Anti-Defamation League. We need not, however, determine the extent and scope or the appropriateness of the privilege in this case, for we conclude that no facts set forth in the affidavits, even though believed, would, under the standards of Restatement 2d, *Torts,* constitute interference with the contract.

Except for the trial judge's reliance on a portion of Restatement 2d, which was adopted in 1969 by the American Law Institute in respect to sec. 766, the parties

appear to rely upon the statement of principles set forth in the original Restatement, adopted in 1939. That section provides:

"Sec. 766. General Principle.
"Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
"(a) perform a contract with another, or
"(b) enter into or continue a business relation with another
is liable to the other for the harm caused thereby." (At 49)

The 1939 comments, and comment *d* particularly, to sec. 766, stress the purpose with which the alleged conduct was undertaken. Comment *d* states:

"The essential thing is the purpose to cause the result [the interference with the employment contract]. If the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other." Restatement, *Torts,* sec. 766, p. 55.

It is thus obvious, even under the original version of sec. 766, that the purpose must be an intentional one. The revised Restatement, which has been in effect since its adoption by the American Law Institute in 1969, makes it even clearer that the alleged tortfeasor's conduct must be intentional. The 1969 version of sec. 766 provides:

"Sec. 766. *Intentional interference with contract*
"(1) One who *intentionally* induces or otherwise *intentionally* causes a third person not to perform a contract with another, other than a contract to marry, is subject to liability to the other for pecuniary loss resulting from the breach of contract." (Emphasis supplied.)

The revised comments of the 1969 version emphasize that it is not sufficient that the contract be interfered

with, even though the conduct of the alleged tortfeasor might have incidentally had that result. Only if the actor intentionally causes the nonperformance can liability follow. E.g., comment *b* uses the term, "intentionally frustrate dealings." (P. 37 of Tentative Draft No. 14 (1969).)

Comment *d* of the original Restatement is revised and recaptioned as comment *h* (P. 41 of Tentative Draft No. 14 (1969)). Comment *h* now provides throughout that the intent of the alleged tortfeasor is all-controlling:

"*h. Induces or otherwise intentionally causes.* The word 'induces' refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences. Thus inducement operates on the mind of the person induced. The phrase 'otherwise intentionally causes' refers to the situations in which A leaves B no choice, as, for example, when A imprisons or commits such a battery upon B that he cannot perform his contract with C, or when A destroys the goods which B is about to deliver to C. Such is also the case when performance by B of his contract with C necessarily depends upon the prior performance by A of his contract with B and A fails to perform in order to disable B from performing for C. The rule stated in this Section applies to any intentional causation whether by inducement or otherwise. The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other. It is not necessary, however, that the intent to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regrettable, means to some other end (see Comment *k*)."

Comment *j*, p. 43, provides that the rules are applicable only where:

". . . the defendant acts for the purpose of interfering with the performance of the contract, and also where he desires to do so, even though he acts also for some other unprivileged purpose."

This comment also applies the rules to a situation in which the defendant:

". . . does not act for the purpose of interfering with the contract, or desire it, but he knows that such interference is certain, or substantially certain, to occur as a result of his acts."

It is indeed correct, as the trial judge stated, that under the present comment $k$, p. 44, that a simple request or persuasion which exerts only moral pressure may convey the alleged tortfeasor's desire to influence the third person not to deal with the other. However, we deem that section inapplicable unless it is apparent at the outset that the alleged tortfeasor acted with the intention to interfere with the employment contract or acted in such a fashion and for such purpose that he knew that the interference was "certain, or substantially certain, to occur."

The facts to show any intent on the part of Sorrin to interfere with the contract between Bartell-Media and Augustine are totally absent. In fact, Sorrin's affidavit, which is not contravened, alleges that he did not discuss the employment status with Barnes at all and that no criticism was directed at Augustine. He also stated that his criticism was directed only to the program policy of the station and was not a threat to the employment relationship of Augustine with the broadcaster.

It is apparent, therefore, that the factual allegations of Sorrin's affidavit, if believed and not controverted by an opposing affidavit, prima facie support the motion for summary judgment. *Leszczynski v. Surges*, 30 Wis.2d 534, 141 N.W.2d 261 (1966). Nothing in the counter-affidavit of the plaintiff creates an issue of fact on the question

of Sorrin's intent to interfere with the contract. There are no allegations that indicate that anything in Sorrin's conduct could reasonably be interpreted to support a finding that the termination of Augustine's contract was certain or reasonably certain as a consequence of the telephone call.

We accordingly conclude that no relevant factual issues were in dispute, and the facts as undisputed indicate, as a matter of law, applying the principles of sec. 766 of the Restatement 2d, *Torts,* that a cause of action for the interference with the contract could not be proved.

Under this state of facts, it is unnecessary to consider the question of privilege, for no cause of action for inducing a breach of contract was provable.

It should be noted also that, by the revision of the Restatement 2d, *Torts,* sec. 766, the question of privilege is deleted entirely from that section and is posed only for consideration as an affirmative defense to a prima facie case. The question of privilege is discussed in sec. 767.

Having found that the facts could not lead to a finding that there was an intentional interference with the contract, the question of privilege does not arise. Accordingly, the summary judgment dismissing the third cause of action is affirmed.

We conclude, therefore, that the demurrer was properly sustained and the summary judgment in respect to the second and third causes of action was properly entered under the pleadings and the affidavits. The entire action against the Anti-Defamation League was properly dismissed.

*By the Court.*—Order and judgment affirmed.