**Jeri RASMUSSEN, et al., Respondents,**

v.

**Tim GLASS, et al., Relators.**

No. CX–92–1792.

Court of Appeals of Minnesota.

April 13, 1993.

Review Granted June 9, 1993.

Thomas W. Strahan, Minneapolis, for relators.

Robert J. Alfton, Minneapolis City Atty., Allen B. Hyatt, Asst. City Atty., Minneapolis, for respondents.

Considered and decided by HUSPENI, P.J., and KLAPHAKE and FOLEY,* JJ.

## OPINION

DANIEL F. FOLEY, Judge.

By writ of certiorari, relators contend a three-member panel of the Minneapolis Commission on Human Rights (Commission) erred by concluding they discriminated against respondents on the basis of creed. Relators argue the Commission erred by (a) defining the term "creed" to include more than religious beliefs and (b) infringing upon their rights of conscience under the Minnesota Constitution. We reverse.

## FACTS

At the time of the events which gave rise to this action, relator Tim Glass owned, managed and conducted business as The Beach Club Deli (Beach Club). The Beach Club served food on its premises, as well as delivering food to customers within a specified delivery area. Respondent Midwest Health Center for Women (Midwest) is a non-profit clinic that provides health care services, including abortions, to its women patients. Midwest is located within the Beach Club's delivery area.

On November 13, 1989, an employee of Midwest called the Beach Club to place a food order. She was told the Beach Club would no longer deliver food to Midwest. The employee informed the director of Midwest, respondent Jeri Rasmussen, of the Beach Club's refusal to deliver food to the clinic. Rasmussen telephoned the Beach Club and complained to the manager, Glass, about the restaurant's decision. Glass informed Rasmussen that the Beach Club refused to deliver food to Midwest because abortions were performed on the premises. Glass told Rasmussen that Glass had taken the position that abortion was murder.

Several days later, Rasmussen contacted the Minneapolis Department of Human Rights (Department). During its investigation, the Department contacted Glass, who told the Department the Beach Club did not deliver food to Midwest on "the grounds of moral conscience" and did not intend to discriminate against particular individuals. Rather, Glass said the decision was part of a "business to business relationship." The Department issued a charge of discrimination in which Rasmussen alleged Glass and the Beach Club discriminated against both she personally and Midwest on the basis of sex, creed and religion. The claim of discrimination based on sex was dropped.

On October 9, 1991, the Commission conducted a hearing on the matter. Only Glass and Rasmussen testified at the hearing. Neither party was represented by counsel. The hearing was conducted in an informal manner. The Commission members questioned Glass and Rasmussen individually, with each party then cross-exam-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

ining the other. Each party also gave a brief closing statement. The entire hearing took less than one hour.

At the hearing, Glass admitted that he had refused to deliver food from his restaurant to Midwest, despite the fact that Midwest was located within the Beach Club's delivery area. Glass explained that the refusal to deliver food to Midwest was not based upon Midwest's pro-choice philosophy. Rather, *the refusal was based upon the fact that abortions were performed on Midwest's premises.* Glass further explained that he would not deliver food to anyone inside Midwest's premises. However, he stated that he would deliver food to Midwest employees if they were not inside the Midwest facility.[1] Glass also stated that he would serve Midwest employees if they came to his restaurant, regardless of their view on abortion.

Rasmussen testified regarding the nature of Midwest's business. She stated that Midwest provided a range of health care services for its women patients, including abortion services. During cross-examination, Rasmussen admitted that approximately 90% of Midwest's business was the performance of abortions. Rasmussen testified about her commitment to the pro-choice position. She also stated Midwest's provision of abortion services was based upon this pro-choice philosophy. Rasmussen testified that both she, personally, and Midwest, remained committed to providing services consistent with their beliefs, including abortions, despite the fact that they had both received a great deal of negative attention in the form of picketing, protests and threats.

On July 31, 1992, the Commission issued its findings of fact, conclusions of law and order, in which it found that the actions of Glass and the Beach Club constituted unlawful discrimination under the Minneapolis Civil Rights Ordinance. The Commission concluded that the Beach Club was a "public accommodation" and that relators' actions fell within the definition of "discrimination" set out in the ordinance. The Commission concluded that, by refusing to deliver food to Midwest because of its commitment to pro-choice beliefs, relator was guilty of discrimination based upon "creed." Based upon its findings and conclusions, the Commission awarded a $500 civil penalty. Relators appealed from the Commission's order by petition for writ of certiorari. Glass is no longer doing business as the Beach Club.

## ISSUES

I. Did the Commission err in defining the word "creed," as used in the Minneapolis Civil Rights Ordinance, to include respondents' political and philosophical position on abortion?

II. Does enforcement of the Minneapolis Civil Rights Ordinance as to relators' refusal to deliver food to a business based upon a sincerely held religious belief opposing that business's practices, violate the Minnesota Constitution?

## ANALYSIS

### I.

■ The first issue before this court is whether relator Glass's refusal to deliver

1. At the hearing, during the panel's questioning of Glass, the following colloquy occurred:
   CHAIRPERSON KABA: So you would serve people if they were prochoice as long as they were not in Midwest?
   MR. GLASS: I would serve people who were prolife. I mean, I would not serve people who were prolife if they were in Midwest. It had nothing to do with whether they were prolife or prochoice.
   CHAIRPERSON KABA: So, in other words, you wouldn't serve anybody in Midwest?
   MR. GLASS: Correct.
   CHAIRPERSON KABA: Whether they were clients or whether they just went there—if they went in there—

   MR. GLASS: If it were Billy Graham, I would not go in there.
   CHAIRPERSON KABA: If they called from Midwest, you wouldn't have served them?
   MR. GLASS: That's correct. I do want to point out that if someone called from Midwest and would meet me outside their door of their business, I would deliver to them.
   While Glass's statement that he would deliver as indicated was made at the time of the hearing and when he was no longer in business, nonetheless, the statement was totally consistent with his attitude and conduct during the relevant time as indicated by his service of pro-choice persons off Midwest's premises.

food to Midwest because he opposed Midwest's performance of abortions constitutes a discriminatory practice in violation of the Minneapolis Civil Rights Ordinance (Minneapolis ordinance). We are convinced it does not. Relator stated he refused to deliver to Midwest "[b]ecause of their practice of *doing* abortions." (Emphasis added.) In her closing statement, Rasmussen stated "[y]ou [Glass] picked an organization that you determined that was *doing* something that you did not agree with." (Emphasis added.) Also, the Commission concluded Glass stopped delivering to Midwest *"because* Midwest *performed* abortions." (Emphasis added.) Thus, at best, Glass's refusal to deliver to Midwest is based on conduct rather than any creed or belief system held by respondents. This analysis is consistent with Glass's testimony that the Beach Club would and did serve pro-choice persons on the Beach Club's premises and would and did deliver to pro-choice persons not on Midwest's premises.[2]

One of the stated purposes of the Minneapolis ordinance is

[t]o prevent and prohibit all discriminatory practices based on race, color, *creed,* religion, ancestry, national origin, sex, including sexual harassment, affectional preference, disability, age, marital status, or status with regard to public assistance with respect to * * * public accommodations.

Minneapolis, Minn., Code of Ordinances § 139.10(b)(2) (1991) (emphasis added).

The Commission held that relators' refusal to deliver food to the premises of Midwest constituted discrimination on the basis of "creed," defining "creed" as a "formulation or epitome of principles, rules, opinions, and precepts formally expressed and seriously adhered to and maintained." The Commission found both Rasmussen and Midwest[3] are "adamantly pro-choice for women" and are committed to providing abortion services, and their pro-choice position "demonstrates a seriously maintained

set of principles and opinions." The Commission concluded respondents' pro-choice position constituted a "creed," and relators had discriminated against them based upon that creed.

Relator Glass contends the Commission erred in defining "creed" to include political, sociological and philosophical beliefs. He argues "creed," as used in the Minneapolis ordinance, refers exclusively to religion and religious beliefs. We agree.

We initially note that this issue has not before been addressed by the courts of Minnesota. Additionally, there is no legislative guidance on the subject. The determination of the meaning of the word "creed" is an issue of first impression. The Minneapolis ordinance does not define the term. *See* Minneapolis, Minn., Code of Ordinances, § 139.20 (1991) (definitions of terms). The Minnesota Human Rights Act, upon which the Minneapolis ordinance is based, also uses the term "creed" without defining it. *See* Minn.Stat. §§ 363.01, 363.03 (1990) (definition of terms and unfair discriminatory practices).

"The construction of a statute is a question of law and is subject to de novo review on appeal." *City of Crystal Police Relief Ass'n v. City of Crystal,* 477 N.W.2d 728, 730 (Minn.App.1991), *pet. for rev. denied* (Minn. Jan. 17, 1992). Accordingly, this court owes no deference to the Commission's definition of the term in question. *See In re Kantrud,* 465 N.W.2d 921, 923 (Minn.App.1991).

■■■ A general rule of statutory construction is that words should be construed consistent with their commonly understood meaning. *See City of Crystal Police Relief Ass'n,* 477 N.W.2d at 730; *see also* Minn.Stat. § 645.08(1) (1990) (canons of construction of words and phrases). Thus, we begin our analysis by considering the meaning of the term "creed" as set out in various dictionaries, as well as case law

---

**2.** Glass testified "I would not serve people who were pro-life if they were at Midwest."

**3.** While there may be a question whether a business entity itself, rather than the individuals

involved in that business, can be pro-choice, we need not address the issue because Rasmussen is an individual.

that has considered the term. Black's Law Dictionary defines "creed" as

> [C]onfession or articles of faith, formal declaration of religious belief, any formula or confession of religious faith, and a system of religious belief.

*Black's Law Dictionary* 370 (6th ed. 1990). Ballentine's Law Dictionary also defines "creed" exclusively in religious terms as

> [a] formal declaration of religious belief. The word has no reference in its ordinary meaning, to benevolent, philanthropic, or fraternal organizations, secret or otherwise, even though of moral character.

*Ballentine's Law Dictionary* 289 (3rd ed. 1969). Even the dictionary cited by the Commission contains multiple definitions of "creed," all of which except the last one which was adopted by the Commission, define "creed" within the context of religion as

> 1: a brief authoritative doctrinal formula beginning with such words as "Credo", "Credimus", "I believe", "We believe", intended to define what is held by a Christian congregation, synod, or church to be true and essential and exclude what is held to be false belief 2: that portion of a Christian liturgy in which a profession of faith is corporately recited 3a: a formulation or system of religious faith b: a religion or religious sect c: a formulation or epitome of principles, rules, opinions, and precepts formally expressed and seriously adhered to and maintained.

*Webster's Third New International Dictionary* 533 (1986).[4] Because "creed" is commonly understood to mean religion and religious beliefs, the Commission's broader definition must be rejected.

We are aware that under Minn.Stat. § 645.16 (1990) "[e]very law shall be construed, if possible, to give effect to all its provisions," *see also* Minn.Stat. § 645.17(2) (1990) (legislature intends an entire statute to be effective), and that our interpretation of "creed" makes the ordinance's reference to religion extraneous. The ordinance, however, cannot be interpreted to make all its terms effective. Under Minn.Stat. § 645.08(1), otherwise undefined terms are construed in accordance with their "common meaning." The common meanings of other classes upon which discrimination is based, "race," "color," "ancestry," and "national origin," are not separate, distinct or nonoverlapping. Therefore, the Minneapolis ordinance has more than one set of duplicative provisions. The definition of "creed" used by the Commission is broad enough to include religion. Therefore, under the Commission's definition of "creed" the word "religion" in the ordinance is superfluous. Alternatively, if the Commission's definition of "creed" is meant to refer only to a system of belief not rooted in a religious tradition, the Commission has then rewritten its adopted definition of "creed" to encompass only "A [*nonreligious*] formulation or epitome of principles." No dictionary or other reference work which we have examined limits the definition of "creed" in such a manner.

Next, we note that the case law from the four states which have defined "creed" also supports relators' argument that the term's definition should be limited to religion. Since the Minnesota Supreme Court has not interpreted the word "creed," under statutory construction standards a definition of "creed" as limited to religion is consistent with cases that have considered the term.

The issue was first addressed in *Cummings v. Weinfeld*, 177 Misc. 129, 130, 30 N.Y.S.2d 36, 37 (N.Y.Sup.Ct.1941). In that case, the court was called upon to determine the definition of "creed" as it was

---

**4.** Webster's almost exclusively religious definition of creed is consistent with that found in other dictionaries. *See, e.g.,* I *The Compact Edition of the Oxford English Dictionary* 600 (1971); *The American Heritage Dictionary of the English Language* 311 (1980); *The Random House College Dictionary* 314 (Revised Ed.1984); *Funk and Wagnalls New Standard Dictionary of the English Language* 610 (1945). Indeed, the encyclopedia *Britannica* discusses "creed" exclusively in religious terms. *See* 3 *Britannica* 723 (15th ed. 1989). Finally, we note that just because a definition is in a dictionary, it is not necessarily a "common" definition of the word. *See, e.g.,* III *The Compact Edition of the Oxford English Dictionary* 169 (1987) ("creed" defined as "[t]he designation of an automatic tape-printing machine invented by F.G. Creed").

used in New York's Public Housing Law. *Id.* The issue arose when petitioners, a group of public housing tenants, brought an action against their landlord for refusal to renew their lease. *Id.* They alleged that the landlord's refusal to continue renting to them was based upon their membership in the Knickerbocker Village Tenants Association, an organization which believed in the right of tenants to organize and act together for their common interest. *Id.* Petitioners argued that this constituted discrimination on the basis of creed. *Id.* The State Housing Commission ruled against petitioners, stating that "creed" referred only to religious beliefs. *Id.* The New York County Supreme Court affirmed, holding that the New York legislature had intended the words "creed" and "religion" to be used interchangeably. *Id.* at 131, 30 N.Y.S.2d at 38.

> The revised record of the New York State Constitutional Convention of 1938 indicates clearly that the purpose of the amendment was to incorporate into the Constitution the substance of these provisions of the Civil Rights Law and other statutes, at the same time giving coverage for all phases of religious discrimination which were dealt with in the existing law. It seems obvious that, with this purpose in mind, the drafters of this constitutional provision against discrimination merely adopted all of the words used in the various sections of the Civil Rights Law, thereby formulating the phrase race, color, creed or religion. The purpose of the declaration was to give protection against racial, religious and color discriminations. Nowhere in the debates is there even the slightest indication that it was intended that the word "creed" embraced any beliefs other than religious beliefs.

*Id.* (citations omitted). The court concluded that it could not "subscribe to the argument of petitioners that the word 'creed' may refer to any beliefs, be they economic, political or sociological." *Id.*

This issue was also addressed in *Shuchter v. Division on Civil Rights*, 117 N.J.Super. 405, 406, 285 A.2d 42, 42 (App. Div. 1971). In *Shuchter*, the plaintiff was a pacifist organization which was opposed to, among other things, the Viet Nam war. *Id.* Plaintiff attempted to rent a storefront, but was turned down, presumably because the property owner was unsympathetic to the organization's beliefs. *Id.* Plaintiff brought a civil rights action against the property owner alleging discrimination based upon creed. *Id.* The Division of Civil Rights dismissed plaintiff's claim for lack of jurisdiction. *Id.* at 407, 285 A.2d at 42. The superior court affirmed, holding that the word "creed" as used in the state's civil rights legislation referred to "the holding of certain beliefs with respect to religious principles." *Id.* at 408, 285 A.2d at 43.

In *Augustine v. Anti–Defamation League of B'nai B'rith*, 75 Wis.2d 207, 213, 249 N.W.2d 547, 550–51 (1977), the Wisconsin Supreme Court defined "creed" within the context of the state's Fair Employment Act. The plaintiff in *Augustine* was a radio announcer who was fired after he failed to control several guests on his show who used various epithets with respect to African–Americans and Jews. *Id.* at 209, 249 N.W.2d at 549. On appeal, plaintiff argued that defendant Anti–Defamation League had engaged in discrimination on the basis of "creed" when it filed a complaint against him because of the statements made by guests on his show. *Id.* at 210–11, 249 N.W.2d at 549. Plaintiff argued that "creed" referred to any "system of belief or opinion," not just those grounded in religion. *Id.* at 214, 249 N.W.2d at 551. The Wisconsin Supreme Court rejected plaintiff's argument, noting that, although "creed" could be defined in general terms, "in its commonly accepted sense and in the preferred dictionary definition [creed] does, however, refer to religion." *Id.* at 215, 249 N.W.2d at 551–52.[5] The supreme court affirmed the dismissal of plaintiff's claim, holding that discrimination on the basis of a system of political philoso-

---

**5.** In *Augustine,* the Wisconsin Supreme Court considered, and then expressly rejected, the def-

inition of "creed" adopted by the Commission in the present case. *Augustine,* 249 N.W.2d at 551.

phy or beliefs was not actionable under the state's discrimination laws. *Id.* (citing *Cummings* and *Shuchter* with approval).

Finally, in *Riste v. Eastern Washington Bible Camp, Inc.*, 25 Wash.App. 299, 302, 605 P.2d 1294, 1295 (1980), the Washington Court of Appeals addressed the meaning of the word "creed" contained in the Washington Law Against Discrimination. The statutory provision at issue invalidated any written restriction relating to real property

> which purports to forbid or restrict the conveyance, encumbrance, occupancy, or lease thereof to individuals of a specified race, creed, color, national origin, or with any sensory, mental, or physical handicap.

*Id.* (quoting Wash.Rev.Code § 49.60.224 (1980)) (emphasis omitted). In affirming the trial court's grant of summary judgment to the respondent landowner, the court first held that "creed, as used in the statute and in its common dictionary meaning, refers to a system of religious beliefs." *Id.* at 302, 605 P.2d at 1296 (citing *Augustine*, 249 N.W.2d at 551). The court then found that the restriction contained in the deed to respondent's land, which purported to restrict the sale of such land to members of Assembly of God church, constituted discrimination on the basis of creed and was therefore, void. *Id.*

Both the "common meaning rule" of statutory construction and the existing case law supports this court's holding that the definition of "creed" extends only to religion and religious beliefs and not, as the Commission held, to *any* beliefs on *any* subject. We adopt the position articulated by the New Jersey court:

> We recognize that the word "creed" has more recently been accepted to embrace meanings other than those of a religious context. We do not believe, however, that it is our function as a reviewing court to expand a legislative enactment because of new trends in the definition of a word. Whether discrimination on the basis of moral, philosophical, social or political values should be condemned or permitted among the citizens of this State is a question most properly answer-

able by the Legislature. The problems involved are myriad and seemingly insoluble by the judiciary.

*Shuchter*, 117 N.J.Super. at 408, 285 A.2d at 43. There is no contention that the beliefs of Rasmussen or the stated mission of the Midwest facility was of a religious nature and this was conceded at oral argument. Finally, whether the term "creed" is used alone or with the term "religion" in the same sentence does not change the meaning of the word creed, for the words are used interchangeably and mean religious belief. *See Cummings*, 177 Misc. at 130–31, 30 N.Y.S.2d at 38.

## II.

Even if it could be soundly argued that the term "creed" contained in the Minneapolis ordinance should be defined by this court to include a nonreligious philosophy such as that held by respondents Rasmussen and Midwest, this court would still be required to reverse the Commission's decision on constitutional grounds. While the Minneapolis ordinance is remedial in nature and therefore should be construed broadly, *see La Bere v. Palmer*, 232 Minn. 203, 205, 44 N.W.2d 827, 829 (1950); *Travelers Ins. Co. v. Tufte*, 435 N.W.2d 824, 829 (Minn.App.1989), *pet. for rev. denied* (Minn. Apr. 19, 1989), a statute cannot be construed so broadly as to violate the state constitution. *See* Minn.Stat. § 645.17(2) (the legislature *does not intend* to violate the state constitution).

Glass contends that both the First Amendment to the United States Constitution and article I, section 16 of the Minnesota Constitution, protect him from being compelled to associate with an abortion clinic when the activity of the clinic is in direct conflict with the free exercise of his conscience. Significant to the decision here is the fact that, as previously noted, even the Commission concluded Glass stopped delivering to Midwest "*because* Midwest *performed* abortions." (Emphasis added.) At best, it was the activity of the facility and not the belief of the director that Glass opposed.

Notwithstanding the fact that the Commission did not make a ruling on this issue, we may review this issue under Rule 103.04 of the Minnesota Rules of Civil Appellate Procedure:

> On appeal from or review of an order the appellate courts may review any order affecting the order from which the appeal is taken and on appeal from a judgment may review any order involving the merits or affecting the judgment. *They may review any other matter as the interest of justice may require.*

(Emphasis added.) The issue of conscience is too important not to be considered in this case, for the facts raise the issue. Indeed, Glass originally told the Department that the Beach Club refused to deliver to Midwest on "the grounds of moral conscience." As "all courts" provide "some latitude and consideration" when addressing the claims of pro se parties, that this issue was not previously raised by the parties in an explicit manner does not make our addressing the issue inconsistent with prior authority. *See Liptak v. State ex rel. City of New Hope,* 340 N.W.2d 366, 367 (Minn.App. 1983). Furthermore, the issue of conscience was fully briefed by relators and not challenged by respondents.

■ Deeply rooted in the constitutional law of Minnesota is the fundamental right of every citizen to enjoy "freedom of conscience." *See In re Welfare of T.K.,* 475 N.W.2d 88, 91–92 (Minn.App.1991). Although relators raise the issue of religious liberty under both the federal and state constitutions, we will limit our analysis to the Minnesota Constitution due to the greater protection it provides. *See State v. Hershberger,* 462 N.W.2d ·393, 396–97 (Minn.1990) (unnecessary to rely on federal law where state constitution provides independent and adequate basis upon which to decide free exercise issue). The supreme court has expressly approved this approach:

> It is axiomatic that a state supreme court may interpret its own constitution to offer greater protection of individual rights than does the federal constitution. Indeed, as the highest court of this state, we are 'independently responsible for safeguarding the rights of [our] citizens.' State courts are, and should be, the first line of defense for individual liberties within the federalist system.

*State v. Fuller,* 374 N.W.2d 722, 726 (Minn. 1985) (citations omitted).

Article I, section 16 of the Minnesota Constitution states, in pertinent part:

> The right of every man to worship God according to the dictates of his own conscience shall never be infringed; * * * *nor shall any control or interference with the rights of conscience be permitted,* * * * but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.

(Emphasis added.) Where rights of conscience come into conflict with other state laws, this language compels the courts to weigh and balance the competing interests in order to determine which should prevail.

Squarely presented then is the issue of whether Glass must yield in conscience and *enter* the Midwest premises to deliver food products to Rasmussen and the employees of Midwest. To resolve this issue, we apply the four-part test referred to in *Hill–Murray Fed'n of Teachers v. Hill–Murray High School,* 487 N.W.2d 857, 865 (Minn. 1992).

The first part of the four-part test requires this court to determine if relators' proffered reason for refusing to enter upon the Midwest premises is based upon a sincerely held religious belief. *Hill–Murray Fed'n of Teachers,* 487 N.W.2d at 865. Glass's statement that his decision was based on "moral conscience" meets this requirement.

Next, we must determine whether the enforcement of the Minneapolis ordinance burdens the exercise of relators' religious beliefs. *Id.* There can be no question that it does. Under the provisions of the Minneapolis ordinance, relator Glass has two choices. He can either associate with an entity that engages in conduct which he finds to be morally offensive, thus compro-

mising his conscience, or he can refuse and be found guilty of discrimination and fined.

Under the third part of the test, this court considers whether the city of Minneapolis has a compelling or overriding interest in the enforcement of the ordinance at issue. *Id.* at 866. We hold that it does not.

Section 16 also expressly limits the governmental interests that may outweigh religious liberty. Only the government's interest in peace or safety or against acts of licentiousness will excuse an imposition on religious freedom under the Minnesota Constitution.

*Hershberger,* 462 N.W.2d at 397. To the extent that this was not an emergency situation, relators' refusal to enter upon the Midwest premises does not create a threat to either peace or safety, nor does it constitute an act of licentiousness.[6]

Because respondents have failed to establish that the city of Minneapolis has a compelling governmental interest under the facts of this case, we need not address the fourth part of the balancing test. *See Hill–Murray Fed'n of Teachers,* 487 N.W.2d at 867 (where government establishes a compelling interest, court must consider whether a less restrictive alternative exists).

The issue here is not whether we agree or disagree with the viewpoint of either relator Glass or respondent Rasmussen concerning abortion. Rather, the question presented is whether Glass has violated the Minneapolis city ordinance by refusing to enter the premises of Midwest for the reasons he stated.

Based upon Glass's testimony before the Commission and the information he provided to the Minneapolis Department of Civil Rights during its investigation, we conclude that his opposition to Midwest's performance of abortions was the product of "moral conscience" and religious beliefs that are sincerely held.

6. The definition of "conscience clause" in Webster's Unabridged Dictionary is totally consistent with the conscience clause contained in article I, section 16 of the Minnesota Constitution:

Glass's rights of conscience, which are jealously guarded by the Minnesota Constitution, are entitled to priority under the facts of this case. *See Hershberger,* 462 N.W.2d at 399–400 (Simonett, J., concurring). Recognizing that priority we observe that respondents concede Glass did nothing to either hinder or interfere with the activity of the medical facility. Finally, we conclude that Glass just exercised his constitutionally protected right of "freedom of conscience" by refusing to enter the premises of Midwest.

### DECISION

The Commission erred by defining "creed" to include more than religion and religious beliefs. Additionally, even if relator Glass's conduct did constitute a violation of the Minneapolis Civil Rights Ordinance, such conduct is protected under article I, section 16 of the Minnesota Constitution. Accordingly, the matter is reversed and the fine rescinded.

**Reversed.**

KLAPHAKE, Judge (dissenting).

Can a public accommodation discriminate by refusing to deliver food to one who strongly holds and publicly proclaims objectionable beliefs on abortion?

Based on the Minneapolis Human Rights ordinance, the Minneapolis Civil Rights Commission answered "no." I would affirm the Commission for two reasons. First, relators have not raised a constitutional freedom of conscience claim which would circumvent the mandates of the ordinance, and no facts indicate relators' actions were premised on religious grounds. Second, the word "creed," as used in the ordinance, should be defined to prohibit the discrimination which occurred in this case because: (1) the common meaning of "creed" includes more than religious beliefs; (2) the canons of legislative construction reject a meaning limited to religion; (3)

[A] clause in a law exempting certain persons from doing certain things prescribed for others, when they have religious or conscientious scruples against performing such acts, as taking oaths, rendering military service, etc.

the facts of the cases cited as equating religion with creed are inapposite; and (4) the human rights ordinance is remedial, compelling a construction consistent with elimination rather than encouragement of discriminatory practices.

Should relators' constitutional freedom of conscience claim relieve them from compliance with the Minneapolis ordinance? Not in this case. Simply put, the four-part test used where religious freedom conflicts with state or local laws does not support reversal of the Commission.

Unlike the majority, I cannot assume that relators' refusal of food deliveries to Midwest was grounded on a strongly-held religious belief against abortion. The Commission made no findings supporting this legal theory. The record shows that relators had previously delivered food to Midwest knowing that Midwest performed abortions. The record reveals that the true reason for relators' stance was not an epiphany, but personal embarrassment caused by relator unexpectedly encountering an acquaintance who was at the clinic for an abortion. It was only after that encounter that relator excluded Midwest from its delivery service. When Midwest confronted relator about the exclusion, relator stated he would not deliver to Midwest and further informed Midwest, apparently by analogy, that he "had a right not to serve drunks." Relator did not offer to deliver to Midwest's door until the hearing, nearly two years after the initial refusal, when relator was no longer in business.

The record lacks factual support for the majority's conclusion that relators' actions have been occasioned only by conscience. At best, such a conclusion is impermissible fact finding on appeal. At worst, it is simply wrong. Without a finding, or even a claim, that strongly and sincerely held religious beliefs motivated relators' conduct, there is no conflict between the Minneapolis ordinance and the Minnesota Constitution, and the constitutional analysis ends.

Even if we assume, as did the majority, that relators' actions were firmly rooted in religious conviction, the second part of the

test has not been met. The majority incorrectly assumes that the Minneapolis ordinance imposes an inherent burden on relators' religious beliefs. Any such burden on relators was self-imposed by their public offer to deliver food to all businesses in a specific area. Where an entity is involved in a public activity, "the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057 (1982).

And under part three of the test, the majority summarily concludes that, because relators' conduct does not create a threat to public peace or safety, the City of Minneapolis has no compelling or overriding interest in the enforcement of its anti-discrimination ordinance. This position was rejected in *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844 (Minn.1985). In *McClure*, the supreme court held that the government's compelling interest in eliminating discrimination and providing equal access to public accommodations outweighed the burden on business owners to comply with the Minnesota Human Rights Act. *Id.* at 852–53.

In my opinion, where the record does not establish that relators' conduct was conscience-driven and where relators' burden was self-imposed, a freedom of conscience claim must fail when balanced against the City of Minneapolis' compelling interest in eliminating discrimination.

What, then, did the City of Minneapolis mean by prohibiting public accommodation discrimination based on "creed"? The Commission referenced Webster's dictionary to determine a common and ordinary meaning. The majority rejects this definition, relying instead on other definitions also found in Webster, and then buttresses its choice with definitions found in specialized legal dictionaries. Yet, the issue is what the Minneapolis City Council intended in its use of "creed," not what lexicographers understood at another time or in a different context. There is nothing compellingly common or ordinary in specialized legal dictionaries. Moreover, the Commis-

sion's reliance on a common and ordinary dictionary definition is consistent with statutory canons of legislative construction, *see* Minn.Stat. § 645.08(1) (1990); reliance on a legal dictionary definition is not.

The Commission's definition is also consistent with other rules of statutory interpretation. By defining "creed" to include more than just religious beliefs, the Commission correctly interpreted the term "creed" to have a broader definition than "religion." *See* Minn.Stat. § 645.16 (1990) (laws construed to give effect to all provisions); *Gale v. Commission of Taxation,* 228 Minn. 345, 349, 37 N.W.2d 711, 715 (1949) (statute should be construed so that no word is superfluous, void or insignificant); *see also Ginsberg v. Department of Jobs & Training,* 481 N.W.2d 138, 143 (Minn.App.1992) (every term of statute should be given meaning), *pet. for rev. denied* (Minn. Apr. 9, 1992). Like the terms "race," "color," and "ancestry," the terms "creed" and "religion" have overlapping meanings but are not synonymous or superfluous in the ordinance. The Commission properly applied a broader definition of "creed" under the rule of statutory interpretation that these terms should not be rendered superfluous.

Additionally, the Commission's broad definition of "creed" better serves the anti-discrimination goals of the Minneapolis ordinance. "Statutes are to be so construed as to * * * promote rather than defeat the purpose of the legislature." *Governmental Research Bureau, Inc. v. Borgen,* 224 Minn. 313, 322, 28 N.W.2d 760, 765 (1947). The ordinance's plain language shows its purpose is to prohibit public accommodations from engaging in discrimination on a wide variety of bases, including

> race, color, creed, religion, ancestry, national origin, sex, including sexual harassment, affectional preference, disability, age, marital status, or status with regard to public assistance.

Minneapolis, Minn., Code of Ordinances § 139.10(b)(2) (1991).[1] To define "creed" as a synonym for "religion" is to imply that the Minneapolis City Council meant to allow discrimination based on non-religious,

strongly held and publicly proclaimed beliefs, despite its broad prohibition against discrimination of all kinds. There is no basis whatsoever for this conclusion.

Is case law helpful in defining "creed" as used in the Minneapolis ordinance? Every case which the majority cites as support for its narrow definition of "creed" is inapposite to the facts of this case. Unlike the Minneapolis ordinance, which contains both the words "creed" and "religion," the civil rights statutes interpreted in these cases only prohibited discrimination based upon "creed." *See Shuchter v. Division on Civil Rights,* 117 N.J.Super. 405, 285 A.2d 42, 43 (App.Div.1971) (interpreting N.J. Stat. Ann. § 10:5–3 (West 1976)); *Riste v. Eastern Wash. Bible Camp, Inc.,* 25 Wash.App. 299, 605 P.2d 1294, 1295 (1980); *Augustine v. Anti–Defamation League of B'nai B'rith,* 75 Wis.2d 207, 249 N.W.2d 547, 551 (1977). As the Wisconsin Supreme Court explained in *Augustine:*

> There is no specific mention [in the Fair Employment Act] of discrimination on the basis of religion. Yet, it would be unthinkable to conclude that any anti-discrimination legislation would not prohibit discrimination based upon religious grounds. "Creed" * * * does, however, refer to religion. It seems abundantly clear, therefore, that the term, "creed," as used in the Wisconsin statute means * * * a system of religious beliefs.

249 N.W.2d at 551–52. And, although the New York Public Housing Law interpreted in *Cummings* did prohibit discrimination based upon "race, color, creed or religion," the statute's legislative history stated that the words "religion" and "creed" were to be used interchangeably. *Cummings v. Weinfeld,* 177 Misc. 129, 30 N.Y.S.2d 36, 38 (App.Div.1941). There is no such legislative history in this case. Neither the facts nor the logic of the cited cases supports a reversal.

I respectfully dissent and would affirm the Commission.

---

1. Section 139.10(b)(2) was last amended in 1982.